[No. 17609.  *En Banc.*  March 19, 1924.]

## G. E. LOVELL, *Respondent,* v. F. E. DOTSON, *Appellant.*[1]

BILLS AND NOTES (138)—FRAUD (12)—EXISTING FACTS—EVIDENCE
—SUFFICIENCY.  While ordinarily fraud cannot be predicated upon
a promise to do some thing in the future, a promise to repurchase
worthless mining stock, made for the sole purpose of inducing the
execution of a note, without intent to perform, constitutes action-
able fraud and avoids the transaction.

BILLS AND NOTES (64, 141)—BONA FIDE PURCHASERS—NOTICE OF
INFIRMITY—FRAUD—EVIDENCE—SUFFICIENCY.  Mere notice that a note
was given in payment for mining stock is not sufficient to put a
purchaser on notice of fraud inducing the purchase, and the fact
that other similar notes were taken, after inquiries from the makers
as to their objections, will not show that the purchasers were not
holders in due course, even when inquiry might have disclosed the
fraud.

Appeal from a judgment of the superior court for
Adams county, Truax, J., entered January 7, 1922, in
favor of the plaintiff, notwithstanding the verdict of a
jury rendered in favor of the defendant, in an action
on a promissory note.  Affirmed.

*Samuel P. Weaver* and *Weaver & Furber,* for appel-
lant.

*G. E. Lovell,* for respondent.

FULLERTON, J.—On April 7, 1920, the appellant, Dot-
son, gave to one Harry Dudman his promissory note
for the sum of $1,200, payable six months after date,
with interest at the rate of eight per cent per annum.
The note was payable at the banking house of the
Pioneer National Bank of Ritzville, and was in form a
negotiable instrument as that term is defined in our
negotiable instruments act.  Rem. Comp. Stat., § 3392
[P. C. § 4072].  At the same time he executed and de-

[1]Reported in 223 Pac. 1061.

livered to Dudman a writing signed by him, addressed
to the bank named, in which he stated in substance that
it would be satisfactory to him if the bank saw fit to
purchase the note. Dudman had theretofore had a
checking account with the bank, and had drawn checks
thereon in excess of the amount thereof. On April 9,
1920, two days after he had received the note from Dot-
son, Dudman appeared at the bank with the note and
desired the bank to purchase it and apply the proceeds,
in so far as might be found necessary, to the satisfac-
tion of his checks. The officer of the bank to whom
the note was presented declined to purchase it, inform-
ing Dudman that it was not bankable paper or such
paper as the bank could handle. The president of the
bank was then called in consultation, and after some
negotiation the president and the bank cashier offered
to loan to Dudman as individuals sufficient to take up
his checks and to take the note as security for the loan.
This transaction was carried out, the officers of the
bank advancing to Dudman the sum of $570 for that
purpose.

Dudman was the president of a mining corporation
which owned a mine located in the state of Idaho. He
was engaged in selling the capital stock of the corpora-
tion, and it was for such stock that the Dotson note
was given. Work upon the mine had been commenced
sometime in the year 1918, and had continued up to at
least as late as April 1, 1920; a witness for the appel-
lant stating that on that day most of the employees quit
work because their wages were not paid for the pre-
ceding month. The status and condition of the mine
at the time the note was given also appears in the testi-
mony of this witness. He testified that the mining
company had expended some forty thousand dollars in
buildings and other improvements on and about the
mining property, that it had constructed a road to it at

a cost of about ten thousand dollars, and that it had done some tunneling, the amount or cost of which was not stated. The witness further testified, however, that it had become apparent as early as the beginning of winter in 1919 that the mine was valueless; that Dudman was frequently at the mine and knew that it was valueless, and that he had caused to be constructed open ore bins at the portal of the tunnel, and had caused these to be filled with selected ores taken from the mine so that "if prospective investors came up there they could see it." The witness also testified that, while picked specimens from the ores taken from the tunnel near its portal showed considerable values, ore taken therefrom beyond the first fifty feet had no value whatever.

Dudman, in selling the stock, seemed to have two principal schemes. He would first attempt to sell the stock outright, and, failing in this, would promise to repurchase the stock at an advanced price if it was returned to him at a later date which he definitely named; representing that the mine had an unlimited quantity of valuable ores, and that the mining company had a temporary need of money to enable it to continue operating the mine until it could complete its preparations for shipping ore, which would occur before the date he named, and at which time the mine would immediately become self-supporting and amply able to take care of its needs. Dudman sold large quantities of the stock, and in certain instances gave a written agreement to the purchaser to repurchase the stock at a stated date. Dotson testified that he made the same agreement with him, and that it was this agreement that induced him to purchase the stock, but in his case the agreement seems to have been oral, as no writing was produced showing the promise. All of the written agreements shown in the evidence were made at a time

subsequent to the time of the sale to Dotson, and there was, of course, no evidence that any of these agreements had been breached prior to the purchase of the stock by Dotson. Nor was there any evidence that it had become generally known that the mine was valueless at the time of the sale of the stock to Dotson, nor any direct evidence that the indorsees of the note had, at the time of its indorsement, any particular knowledge to that effect, or any more knowledge of the honesty or dishonesty of the transaction than had Dotson himself.

Before the maturity of the loan which the note was given to secure, and before the maturity of the note itself, it became known that the mining stock was worthless, and that the maker of the note had received no valuable consideration for its execution. Dudman did not pay the loan made to him by the officers of the bank, and Dotson refused to pay the note. The holders of the note thereupon assigned the note for collection to the respondent, Lovell, who instituted the present action to recover thereon. To the complaint, which was in the form in common use in such cases, Dotson set up want of consideration for the note; that he was induced to execute it by the fraud of Dudman, and that the purchasers of the note had notice and knowledge of the fraud at the time they purchased it. The reply was in substance a general denial of the affirmative allegations of the answer, and on the issues thus made, the cause was tried to the court sitting with a jury. The jury returned a verdict in favor of the defendant, Dotson, whereupon the plaintiff moved for judgment notwithstanding the verdict. This motion the court granted, entering a judgment in favor of the plaintiff for the amount paid for the note, with interest. The appeal before us is from the judgment so entered.

On the first question discussed in the arguments—

whether there was sufficient evidence of fraud in the transaction by which Dotson was induced to execute the note to sustain a verdict so finding—we are constrained to agree with the appellant. It is perhaps the general rule, as the respondent argues, that fraud cannot ordinarily be predicated upon a promise to do something in the future, even though the promisor does not perform, but there are exceptions to the rule. As we said in *Hewett v. Dole,* 69 Wash. 163, 124 Pac. 374, where a promise is made merely as a means of deceiving, and with no intention to perform, it constitutes such fraud as will entitle the injured person to relief. In this instance, if the witness to whose testimony we have specifically referred is entitled to be believed, and whether he was so or not was a question for the jury, Dudman knew, at the time he made the promise which induced the execution of the note, that the mine was valueless and that there was then no possibility of obtaining from the products of the mine sufficient funds to redeem his promise, and we think the evidence sufficiently clear that he had no other resource from which to obtain them. The conclusion follows inevitably that his only purpose in making the promise was to deceive, and this, under the rule of the cited case, was sufficient to avoid the transaction.

But the trial judge rested his conclusion on the other branch of the controversy. He held that there was no substantial evidence tending to show that the immediate indorsees of Dudman, at the time of the indorsement, had notice or knowledge of any infirmity in the note; holding further that, since such indorsees had made an advancement to Dudman on the security of the note prior to its maturity, they were holders in due course as that term is defined in the negotiable instruments act, to the amount of such advancement, and, as

they made no greater claim, were entitled to judgment for such amount.

With this holding we are inclined to agree. As we have heretofore said, there was no direct evidence tending to show that the indorsees of the note had notice or knowledge of its infirmity at the time they made the advancements on the faith of it as security. The circumstances relied upon to show such notice, we think wholly insufficient for that purpose. One of these is that they knew that the note was given for the purchase of mining stock. But Dotson himself knew this much, and nevertheless purchased the stock. If such a transaction is in itself fraudulent, then Dotson participated in the fraud, and seemingly he would be estopped from urging it as a defense to his note given in pursuance of the fraud. But it is not the rule that such transactions are fraudulent, or even presumptively fraudulent. This court has a number of times so held. In one such case we used this language:

"In the final analysis, the question really urged which we are attempting to discuss, is, in effect, that, as the note arose out of a stock transaction, the jury should have been permitted to find that one knowing, or having reason to believe that a note was so given, could not purchase it in good faith. It may be admitted that farmers and others are all too often fleeced by the sale to them of worthless stock, and the legislature might well take steps to put a stop to this crying evil, but until the legislature does act, we cannot say from our judicial knowledge that all stock transfers are fraudulent, or even that a considerable percentage are so, and much as we would like to protect all who are victimized, we cannot do so at the expense of the innocent, or in defiance of well-established law. Neither can a jury be permitted to draw the inference that one purchasing negotiable paper does so in bad faith merely because he knows the paper had its inception in the purchase of corporate stock." *Larsen v. Betcher,* 114 Wash. 247, 195 Pac. 27.

See, also, *Wells v. Duffy,* 69 Wash. 310, 124 Pac. 907.

Another circumstance is that the bank of which the indorsees in the present case are officers had purchased other notes given to Dudman in transactions relating to stock in this mine. But the evidence is that these were purchased before the fraudulent nature of the Dudman transactions became generally known or known to the officers of the bank. There is no evidence that it made any such purchases after it had that knowledge. Moreover, they were purchased usually after the officers of the bank had made inquiry of the makers of the notes concerning them, and after they had received assurances from such makers that there was no objection on the makers' part to the purchase. But even the fact that the bank made such inquiries is urged as a suspicious circumstance. We cannot, however, so regard it. Indeed, it seems to us that the presumption would be the other way—that it is rather evidence of good faith than it is evidence of bad faith for a person who contemplates purchasing a promissory note to inquire of the maker whether or not it is genuine. Certainly in no instance could such an inquiry work an injury to the maker, and certainly in some instances it could save him from the sufferance of a loss. Still another circumstance is that one of the victims of Dudman had stated to some person connected with the bank that he believed Dudman's transactions were of a dishonest nature, "a swindle," to use the language of the witness. But the witness was uncertain as to time the communication was made. In one part of his testimony he does say that it was before the date of the present transaction, but in another that it was nearly a month later. But aside from this, there is no showing that the statement was communicated to these particular officers of the bank.

Nor was it shown that the witness was expressing anything more than his own suspicions. Furthermore, as evidence that he was not thoroughly convinced of the dishonesty of Dudman, is the fact, testified to by himself, that he entered into a transaction with Dudman, subsequent to that time, in which he gave his own note in the payment of the purchase price of other capital stock of this mining company sold to him by Dudman.

It is possible, of course, that inquiry at the time of the indorsement of the note would have disclosed the fraud of Dudman. But it is equally possible that the same result would have followed an inquiry made at the time the note was executed. Inquiry was more the duty of the maker of the note than it was the duty of the indorsees. It was the maker who gave the note currency by putting it afloat, and he cannot visit upon its indorsees the losses caused by his own lack of vigilance. Our conclusion is, therefore, that there was no evidence, or inference from evidence, which would warrant the conclusion that the indorsees were holders in bad faith, and that the trial court did not err in holding otherwise.

The judgment is affirmed.

MAIN, C. J., PARKER, HOLCOMB, TOLMAN, MACKINTOSH, BRIDGES, and MITCHELL, JJ., concur.