We find no reversible error in instruction No. 23, as given by the court.

The judgment is affirmed.

JEFFERS, SCHWELLENBACH, and GRADY, JJ., concur.

SIMPSON, C. J., concurs in the result.

[No. 30820. Department Two. August 18, 1949.]

JAMES P. CHILES, *Appellant,* v. JEAN KAIL, *Respondent.*[1]

[1]Reported in 208 P. (2d) 1198.

Grady, J., dissents.

Frank C. Trunk, Rummens & Griffin and Kenneth P. Short, for appellant.

Will G. Beardslee and Lynn J. Gemmill, for respondent.

Schwellenbach, J. — Plaintiff commenced an action against defendant for the sum of $12,314.84, given by him to her between April, 1940, and March, 1945, in reliance upon her promise to marry him, alleging that the money was obtained by fraud and trickery. The defense was that the action was barred by the statute of limitations.

At the time of the trial, plaintiff was a bachelor, sixty-two years of age. He is assistant engineer at the Seattle Public Library and the National Biscuit Company. In May, 1940, he was walking down Fourth avenue in Seattle, when he was accosted by defendant. She smiled at him and called him by name. He did not recognize her. She said that she had met him at a civil service ball. He took her to dinner. She asked why he had never married. He replied that no one would have him. She said, "Would you marry me?"

After dinner she took him out to her house and introduced him to her younger sister, Marion. Although she denied it, even at the trial, there is no doubt that Marion is her daughter. A couple of days later, she called him on the telephone, and from then on, for the next two months, they were together almost every day.

By July, he was in love with her and it was agreed that they would be married. She told him that she had been married and had had a "bad time." She asked if it would

be all right to let her settle up some things and be married around Christmas. She said that she was behind in the rent and owed some bills, and he agreed to give her $65 a month for living expenses. By Christmas he had given her $2,304.13. In January he protested because they had not married. She then told him that she had obtained an interlocutory order from Rousseau, her husband, but that her lawyer was holding up the final decree; so he gave her $75 and later paid the lawyer $25 additional, after which the final decree was entered.

Still, she did not marry him. By July he had become insistent, so she promised to marry him at Christmas. Each year she reiterated her promise of a Christmas marriage. He always bought her a dress at Christmas time to be married in, but he never saw it on her. There was never any sexual intimacy. In addition to the $65 a month, he bought her clothes, toiletries, fixed up the house, made payments on a piano and a car. From time to time he would cease making payments to her and then she would come to him and make up. But she always put off the marriage date.

This continued until 1944, when he broke off for two or three months. Then in May she came to him and told him that she had remarried Rousseau, but had not lived with him and could therefore obtain an annulment. She said that Rousseau was in an army camp in California; that he claimed an interest in her house, but that for three hundred dollars he would give her a quitclaim deed; that if she could go down there and pay him, then come back and get an annulment that would be the final hurdle, and they could get married at last. So he gave her eight hundred dollars and she left.

From June 6, 1944, to April 14, 1945, she sent him fifty-six letters and postcards, which are very revealing. Most of them asked for money or clothes. In addition, she sent sixteen telegrams for money and placed several long distance calls for the same purpose. The trial court summed it up:

"So the theme song running all through this correspondence and through the telegrams from first to last was well

expressed in the first three words of the telegram of July 26th, Plaintiff's Exhibit '57': 'Honey, wire money.'

"That was the gist of all her communications with the defendant."

The letters all contained endearing terms, and although they include no specific promise of marriage, there is no question but that such a promise was intended to be inferred. On June 6th, she wrote for four hundred dollars. June 10th, she wanted him to wire four hundred twenty-five dollars. She said she would be home in a few days. June 13th, she wrote from Bakersfield:

"Honey, I'll send an Air Mail post card when I leave and I'm hoping you'll take the bus down to Portland and meet me. . . . Did you take care of the piano? The car payment will be due soon too. I hope some day I can be a real pleasure to you Jim instead of a big debt. . . . Write to me often, honey. Be sure and tell me about the piano because I'll feel better. Love til I see you and I hope that will be dog gone soon. Your Jean."

June 16th she wrote that she was leaving Friday and to send twenty dollars. Later she wrote that the lawyer wanted one thousand dollars instead of three hundred dollars and to send five hundred dollars more. June 28th she said she was going to Las Vegas to establish residence and that it would take ninety days. She listed what she wanted for her birthday: 2 pair shoes; 2 pair bobby sox; seersucker dress; 2 blouses; panty girdle.

Then she had to go to the hospital for a very serious operation which would be quite expensive. Instead of sending small amounts, it became necessary to send large amounts. Each time she was ready to go to the hospital, her doctor would get sick and the operation was delayed. This required more money. A friend of hers met Chiles in Seattle and said that Jean needed twenty dollars, which she would send to her. Jean denied asking her friend to obtain money for her, and was very indignant that anyone could be so deceitful.

This went on for months. She was finally operated upon and then had to recuperate. During the time she was in

California he sent her $2,787, and, in addition, paid bills and bought merchandise totaling $680.49. In each letter, she expected to be home "real soon." In the spring, she wrote that Marion was going to have a baby. She wrote that she was going to Los Angeles for a couple of weeks.

The latter part of March, he had a feeling that she was home. He called the house and was told that the telephone was disconnected. That evening he went out and knocked at the door, but no one answered. He heard the telephone ring inside and someone answered it. The next day, when he was supposed to be at work, he went out again and knocked on the door. Jean answered and said, "Who is there?" He was very happy to hear her voice and wanted to come in, but she said the doctor was there with Marion and she could not come out. That night he went back again, and the caretaker came to the door. The latch remained on. Chiles asked how Jean was, and how she walked, and everything about her. The caretaker said, "There is no use. You can't get in." When Chiles asked what it was all about, he replied, "I have orders not to let you in." Later that night Chiles heard Jean talking to a man in Marion's bedroom.

Finally he came to his senses. He felt as if he had been cheated. All these letters were "just humbug." Jean went back to California the next day without contacting him, but even after that she wrote to him and called him long distance. However, he had had enough.

The truth was that she never remarried Rousseau at all. On June 13th, the day she wrote the letter from Bakersfield, heretofore quoted, she married a soldier named Davis. As a result of that marriage, she obtained allotment money from the government. She testified in her defense that she had first married Davis in 1943 when they were both drunk; that she never knew where the ceremony was performed and could not find the marriage certificate; that she told Chiles all about the escapade; that in the spring of 1944 she thought she was pregnant by Davis and went to California to remarry him, intending to divorce him immediately; that

the veiled promises made to Chiles in the letters were not promises of marriage; that because he had been so nice to her, she was going to have a different relationship with him. The trial court did not believe her testimony, nor do we.

The trial judge entered an order of dismissal at the close of the plaintiff's case. He was of the opinion that the statute of limitations barred recovery on the agreement of July, 1940, and, as to the later agreement, he stated:

"But there again, from his knowing or believing that she was remarried to Rousseau, and advancing money to straighten up her affairs, looking forward to an eventual annullment of that marriage—at least it was a valid marriage until annulled in his mind—actually there was no marriage. But I believe that the law will not lend itself to enforce a contract of that kind. I think he was defrauded badly on that.

"Unfortunately, in the opinion of the court, it is just one of those situations you have to write off to experience and the price that must be paid when a generous and unsuspecting man meets a greedy and unscrupulous woman."

■ We agree with the trial court as to the promise of 1940. The fraud was discovered in, January, 1941. The action was not commenced within three years from the discovery of the facts constituting the fraud, and is therefore barred by the statute of limitations. Rem. Rev. Stat. (Sup.), § 159 [P.P.C. § 73-11].

We now concern ourselves with the promise made in May, 1944. Respondent told appellant that she had remarried Rousseau, but had never lived with him; that by paying him three hundred dollars he would give her a quitclaim deed to the house; then she could obtain an annulment and the parties could be married at last. Relying on that promise, appellant gave her $800, $2,787, and $680.49.

■ The elements of actionable fraud are stated in 37 C. J. S. 215, Fraud, § 3, as follows:

"(1) A representation. (2) Its falsity. (3) Its materiality. (4) The speaker's knowledge of its falsity or ignorance of its truth. (5) His intent that it should be acted on by the person and in the manner reasonably contemplated. (6) The hearer's ignorance of its falsity. (7) His reliance on its

truth. (8) His right to rely thereon. (9). And his consequent and proximate injury."

All of the elements, with the exception of (8) are so obvious in this transaction that no discussion of them is necessary.

■ In determining a person's right to rely upon fraudulent promises, we cannot, in this case, be guided by the test of what a reasonable and prudent man would have done under the same or similar circumstances. The court will take judicial notice that a man in love, and especially an old man, is neither reasonable nor prudent. The question is not whether a reasonably prudent man would have relied upon respondent's promise, but whether this appellant, in the condition he was then in, had a right to rely thereon. We have been unable to find any case where the facts occasioned a decision on a problem similar to that now confronting us. Perhaps this is because, in the history of the dealings of maids with men, no maid ever before attempted to deceive in the brazen manner in which this respondent acted. It therefore becomes necessary to delve into virgin territory in consideration of our present problem.

The parties were not dealing at arm's length. There was clearly a confidential relationship existing between them. She had had him dangling since 1940. He was in that state of mind wherein he implicitly believed anything she told him.

"The policy of the courts is, on the one hand, to suppress fraud and, on the other, not to encourage negligence and inattention to one's own interests. The rule of law is one of policy. Is it better to encourage negligence in the foolish, or fraud in the deceitful? Either course has obvious dangers. But judicial experience exemplifies that the former is the less objectionable and hampers less the administration of pure justice. The law is not designed to protect the vigilant, or tolerably vigilant, alone, although it rather favors them, but is intended as a protection to even the foolishly credulous, as against the machinations of the designedly wicked." 23 Am. Jur. 948, Fraud and Deceit, § 146.

However, there is a matter of public policy to be considered here.

■ A marriage is valid unless one or both of the contracting parties is incapable of entering into the marriage contract. When such facts are shown, the marriage is held to be void *ab initio*. In other words, there never was a marriage. *Beyerle v. Bartsch*, 111 Wash. 287, 190 Pac. 239.

■ We have held that when the parties are capable to and do enter into a valid marriage ceremony, it remains a valid marriage and cannot be annulled, and that the question of subsequent sexual intercourse would be wholly immaterial. *Tisdale v. Tisdale*, 121 Wash. 138, 209 Pac. 8.

Appellant testified, and we believe him, that he did not know that the marriage to Rousseau, if it had been true, could not have been annulled because the parties had not lived together. We are satisfied that he was acting in entire good faith and was in no way attempting to interfere with an existing marital relationship. But, had her story of her remarriage to Rousseau been true, it would have been a valid existing marriage, which could not have been annulled, *and it was upon that supposed set of facts that he relied and made the subsequent payments to his detriment.*

■ So we are faced with a situation where a kindly, trusting man is woefully deceived by a designing woman, truly a case for the interference of a court of equity, and, to be weighed against that, the long established public policy of this state, that the marriage relationship is to be held sacred, and that anyone who furnishes funds to break up that relationship cannot recover such expenditures in the courts. A court is naturally incensed because of such treatment of a trusting man, and justly so. But, we must not permit our feelings to overcome our responsibility to this long-established rule of public policy.

We feel very sympathetic toward the appellant. He has been grievously and ruthlessly treated by this adventuress. But we feel that, when the public policy of the security of the marriage relationship and the damage because of fraud to an innocent party are in the balance, the former outweighs the latter. Under the circumstances, we are of the opinion that appellant had no right to rely upon re-

spondent's statement that she could and would obtain an annulment from Rousseau because they had not lived together. His agreement to furnish financial assistance was contrary to public policy. Therefore, the law can afford him no redress.

The trial court was correct in sustaining the challenge to the evidence, and the judgment of dismissal is affirmed.

SIMPSON, C. J., ROBINSON, and JEFFERS, JJ., concur.

GRADY, J. (dissenting)—I am unable to agree with my associates that appellant advanced money to respondent for the purpose of interfering with any marriage that may have existed between herself and Rousseau. I gather from the credible testimony that respondent informed appellant she had remarried Rousseau, but had not lived with him as his wife; that Rousseau had made known to her he desired to marry someone else; that he claimed a community interest in some property she had acquired and would give her a quitclaim deed thereto if she would pay him three hundred dollars; that she had a number of bills to pay and would need eight hundred dollars to make a trip to see Rousseau, get the deed, and pay the bills; that, when she accomplished these things, she would then be in a position to have the marriage annulled. Respondent admitted in her testimony that she had never intended to marry appellant. All the money appellant advanced to respondent was upon the condition that she marry him. Promises made with the intention not to keep them are fraudulent, and relief may be had by the defrauded party. This is an exception to the general rule that a promise to do something in the future although not performed is not a ground upon which to base an action for relief on account of fraud. *Jacquot v. Farmers' Straw Gas Producer Co.*, 140 Wash. 482, 249 Pac. 984, and cases therein cited.

We thus have a situation where a man over a period of years in good faith and with honorable intentions advanced money to a woman with whom he was in love, relying on her continued promises to marry him and without which he would not have made such advances. It is my opinion

that, in such circumstances, a constructive trust arises; and when it becomes apparent to the one who advances money that he has been defrauded, he may invoke the jurisdiction of a court of equity to have a trust declared and appropriate relief given. Many of the cases on this subject are those where the legal title to property has been placed in one person under such circumstances as to make it inequitable for him to have the benefit of it, but the same principle extends into a vast and varied field. In *Seventh Elect Church in Israel v. First Seattle Dexter Horton Nat'l Bank*, 162 Wash. 437, 299 Pac. 359, we said:

"Where, for any reason, the legal title to property is placed in one person under such circumstances as to make it inequitable for him to enjoy the beneficial interest, a trust will be implied in favor of the persons entitled thereto. This arises by construction of equity, independently of the intention of the parties. Equity will raise a constructive trust and compel restoration, where one through actual fraud, abuse of confidence reposed and accepted, or through other questionable means, gains something for himself which, in equity and good conscience, he should not be permitted to hold."

A statement of the rules relating to constructive trusts and which I think fits the situation we have before us, is in 54 Am. Jur. 167, Trusts, § 218 *et seq*. The author states that the forms and varieties of constructive trusts are practically without limit; that the classification of constructive trusts necessarily is somewhat overlapping, and that a single transaction, act, or set of circumstances may involve several fraudulent or wrongful aspects, any one of which would justify the imposition of a constructive trust; that although the mere failure to carry out a promise can not create a constructive trust, since such a breach does not in itself constitute fraud or abuse of confidence, the breach may, in connection with other circumstances, give rise to a trust; that a distinction exists with respect to the creation of a constructive trust between the breach of a promise not fraudulently intended and the breach of a promise made with no intention of performing it. These same ideas are expressed in

Restatement of the Law on Restitution and Constructive Trusts (Sup.) § 160. The authors refer to cases which hold:

" 'A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee.'

" 'A constructive trust is then the remedial device through which preference of self is made subordinate to loyalty to others.' "

In the same section, reference is made to what was said by Dean Pound in one of his articles in 33 Harv. L. Rev. 420:

" 'A group of cases involving constructive trusts invite consideration of what such a "trust" really is. An express trust is a substantive institution. Constructive trust, on the other hand, is purely a remedial institution. As the chancellor acted *in personam,* one of the most effective remedial expedients at his command was to treat a defendant as if he were a trustee and put pressure upon his person to compel him to act accordingly. Thus constructive trust could be used in a variety of situations, sometimes to provide a remedy better suited to the circumstances of the particular case, where the suit was founded on another theory, as in cases of reformation, of specific performance, of fraudulent conveyance, and of what the civilian would call exclusion of unworthy heirs, and sometimes to develop a new field of equitable interposition, as in what we have come to think the typical case of constructive trust, namely, specific restitution of a received benefit in order to prevent unjust enrichment.' "

We recognized a comprehensive definition of a constructive trust in *Carkonen v. Alberts,* 196 Wash. 575, 83 P. (2d) 899, 135 A. L. R. 209. In that case, we noted the distinction between resulting and constructive trusts and quoted the following definition of the latter:

" 'Constructive trusts on the other hand have none of the elements of an express trust, but arise entirely by operation of law without reference to any actual or supposed intention of creating a trust, and often directly contrary to such intention. They are entirely *in invitum,* and are forced upon the conscience of the trustee for the purpose of working out right and justice or frustrating fraud.' "

.Where there exists a constructive trust of the kind we have in this case, the statute of limitations does not commence to run until it becomes known to the defrauded party that promises furnishing the foundation for the trust were not going to be kept. *Ackerson v. Elliott,* 97 Wash. 31, 165 Pac. 899. The action was timely brought by appellant.

The judgment of the court should be reversed, and the cause remanded with directions to enter a decree declaring that respondent became a constructive trustee of all of the money advanced to her by appellant, directing that such money be returned to him, and, as additional relief, that he be awarded a money judgment therefor.