[No. 40324.    Department Two.    July 31, 1969.]

H. W. BECKENDORF *et al., Respondents,* v. RODNEY W. BECKENDORF *et al., Appellants.**

*Reported in 457 P.2d 603.

*O'Leary, Meyer & O'Leary* and *Ernest L. Meyer,* for appellants.

*Eisenhower, Carlson, Newlands, Reha & Sinnitt, Merton Elliott,* and *Paul Sinnitt,* for respondents.

ROSELLINI, J.—This is an action by the aged parents of Rodney Beckendorf, brought against Rodney and his former wife Mary Jean, to rescind a deed which the parents made in 1962 covering their ranch in Thurston County. The action was begun the day the divorce decree was entered, which decree awarded to the wife a one-half interest in the property.

Rodney Beckendorf thereafter reconveyed his interest in the property to his parents and defaulted in this action. He appeared as a witness in behalf of his parents and testified that at the time the property was deeded to him and his former wife, he made promises to his parents which he did not intend to keep. The trial court found that these promises were fraudulent and that, although Mary Jean Beckendorf did not participate in them, she knew of them.

The court concluded that Mary Jean held her interest in the property in trust for the plaintiffs and ordered that the title be restored to them. She has appealed from the judgment entered on the findings and conclusions and contends that the evidence does not support the finding of fraud, and that, in any event, the statute of limitations bars the action.

The trial court based its findings and its judgment upon the testimony of Rodney that he intended to defraud his parents. The gist of his testimony was that he promised his parents that, if they would convey the property to him, he would allow them to live upon it for the rest of their lives and would share the profits of the cattle business with them 50-50, paying *all of the expenses* out of his half, and that he would operate the farm.

The evidence showed that, while Rodney and his wife had lived on the ranch with his parents for periods of time

during their marriage (which was entered into in 1943, and as the fruit of which four children were born), the operation of the ranch had been almost exclusively in the hands of the parents; that at the time the deed was executed, the father had suffered a stroke from which it was feared he would not recover; that Rodney was employed by Nalley's in Oregon, and had recently been assigned to work in Tacoma; that he worked at his job during the day and commuted to the ranch during his father's illness, while his wife was preparing to move the family from Oregon to Washington; that his parents knew that the ranch would not support both families and that Rodney would have to continue his job if he was to meet his obligations.

Whether the ranch had been profitable in the past was a question which was not clearly resolved by the evidence. There was no documentary evidence produced to show that it had been profitable, and income tax returns showed that it operated at a loss; however, this was explained as attributable to the deductions for depreciation. While Rodney said he knew that one half of the gross income would not be adequate to pay the expenses, the father was in a better position to know, since he was more familiar with the operation. He testified that it was profitable and that the promise to pay all of the expenses out of one half of the gross income did not appear unreasonable to him, and, in fact, that one half of the gross income had been sufficient to pay them in the past.

If this testimony was correct it was Rodney who was laboring under a misapprehension of the facts. Any lack of good intentions on his part could not harm the plaintiffs, so long as he did not claim any of the proceeds from the ranching business for his own use, and there is no evidence that he ever did assert such a claim. If the testimony of the plaintiff father was incorrect, it was not because he had been deceived as to the facts by his son. The plaintiffs knew better than anyone else whether this testimony was correct. If it was incorrect, it was not because of any deception practiced by the defendants.

There was no showing that the operation was less profitable after the deed was given than before and no showing that Rodney appropriated any of the income to his own use. There was, in fact, no showing that Rodney did not keep his promises, other than the bare assertions by the plaintiffs that he did not pay all of the expenses out of his one half of the gross income and did not use any of his own funds to supplement that income. Of course, it will be noted that Rodney did not expressly promise to pay the expenses out of his income from other sources, he merely promised to pay *all* of the expenses out of his share of the income. There was no dispute that, if Rodney had kept his promise to operate the farm, he would have had to give up his job with Nalley's; and if he had done that, he would have had no outside income.

In fact, he never attempted to operate the farm. His father recovered and resumed the operation, buying and selling cattle, borrowing money in the spring to finance the raising of the calves and paying it back when they were sold, just as he had been accustomed to do in the past. Rodney continued with his job at Nalley's and all seemed to be satisfactory to the parties until the divorce materialized, and not until the final decree was entered did the parents complain that they had been defrauded.

The evidence does not show that there was any change in the circumstances of the parties other than the divorce itself. The plaintiffs were never ordered to leave the farm and neither Rodney nor Mary Jean ever attempted to interfere with the plaintiffs' operation of the farm or claim any of the proceeds of sales,[1] except for one incident which occurred after this action was instituted.

On that occasion, Mary Jean learned that wood was being cut on the farm and, although she had agreed that

---

[1]The defendants did, apparently at the plaintiffs' request, execute a mortgage immediately after the deed was executed, as security for a $20,000 loan. The $20,000 was used in the following manner: $11,000 was used to pay existing indebtedness of the plaintiffs; the sum of approximately $2,000 was given to the plaintiff Hazelle Beckendorf; the sum of approximately $1,200 was used to pay the cost of installing a

firewood could be cut, she received the impression that wood was being cut and sold. Through her attorney she requested an accounting, reminding the plaintiffs that the court had awarded her a one-half interest in the property. Insofar as the record discloses, the plaintiffs did not offer an accounting, but the cutting of the wood was stopped.

This incident and the occurrence of the divorce are the only changed circumstances which the plaintiffs rely upon as notice to them that the defendants' promises would not be kept. The request for an accounting was not a repudiation of the promises made by Rodney. There was no evidence that Mary Jean demanded possession of the farm or an accounting of the proceeds of the cattle business. Furthermore, a demand for an accounting is not in itself inconsistent with the promise to pay the expenses out of one half of the gross income. An accounting would be necessary in order for the defendants to know whether that portion of the income was sufficient to pay the expenses, and whether there was any surplus to which the defendants would be entitled under the agreement.

Since it was the plaintiffs who operated the farm and conducted the cattle business, who received the proceeds and applied them to the payment of obligations and expenses, it was they who were in a position to prove whether one half of the proceeds was or was not adequate to cover the expenses. They offered no books of account showing the gross income and expenses over the years, although they did produce checks showing that they had paid the expenses. This in itself was not sufficient to show that the expenses exceeded Rodney's half of the gross income, and, as we have heretofore noted, there was no express promise to use his salary to pay expenses if one half of the gross income was insufficient.

Rodney Beckendorf had a family to support and his sal-

heating system in the house occupied by the plaintiffs on the property that is the subject matter of this suit; and the balance, of said funds was spent jointly by the plaintiff H. W. Beckendorf and the defendant Rodney W. Beckendorf, for the purchase of cattle to be raised on said farm. (Finding of fact No. 4.)

ary from Nalley's was about $8,000. His parents conceded that he could not afford to subsidize the farm and at the same time meet his family obligations. Their testimony showed that they did not seriously expect him to give up his job and operate the farm if the father was able to resume its operation, which proved to be the case. Certainly they never made any demands upon him. His mother said that she knew it would be useless.

■ As we have said many times, fraud will not be presumed and must be proven by evidence that is clear, cogent, and convincing. However, as the plaintiffs point out, where there is a conflict in the evidence, the trial court is entitled to accept the testimony of one witness and reject the opposing evidence. That is what the trial court did when it accepted the testimony of Rodney that he made the promises and did not intend to keep them. However, the mere making of promises without a present intent of keeping them does not in itself establish fraud. It must be kept in mind that fraud is composed of a number of elements.

The elements necessary to establish fraud—all of which must be shown by clear, cogent, and convincing evidence —are a representation of an existing fact; its materiality; its falsity; the speaker's knowledge of its falsity; his intent that it shall be acted upon by the person to whom it is made; ignorance of its falsity on the part of the person to whom it is addressed; the later's reliance on the truth of the representation; his right to rely upon it; and his consequent damage. *Williams v. Joslin,* 65 Wn.2d 696, 399 P.2d 308 (1965); *Michielli v. United States Mortgage Co.,* 58 Wn.2d 221, 361 P.2d 758 (1961); *Chiles v. Kail,* 34 Wn.2d 600, 208 P.2d 1198 (1949).

The burden is upon the plaintiff to prove the existence of all the essential and necessary elements of fraud and all the ingredients must be found to exist, since the absence of any one of them is fatal to recovery. *Puget Sound Nat'l Bank v. McMahon,* 53 Wn.2d 51, 330 P.2d 559 (1958).

■ This court subscribes to the general rule that, while a mere unfulfilled promise cannot constitute fraud, a prom-

ise made with no intention of keeping it is a "misrepresentation of an existing fact"—the speaker's state of mind —and may be the basis of an action in fraud if the other elements are present. *Murdoch v. Leonard,* 1 Wn.2d 37, 95 P.2d 37 (1939); *Rennebohm v. Rennebohm,* 153 Wash. 102, 279 P. 402 (1929); *Kritzer v. Moffat,* 136 Wash. 410, 240 P. 355, 44 A.L.R. 681 (1925); *Lovell v. Dotson,* 128 Wash. 669, 223 P. 1061 (1924).

Applying these rules to the facts of this case and accepting the trial court's findings on conflicting evidence, we observe first that a promise was made without a present intention of keeping it, that promise being to operate the ranch and pay all of the expenses out of one half of the gross income. The other promises made by Rodney were obviously made with the intention of keeping them, since they were faithfully kept from the time the deed was given. These were the promises to allow the plaintiffs to live on the farm the rest of their lives and to enjoy the profits. In fact, the evidence showed that the plaintiffs have continued to live and to operate the ranch substantially as they did before the deed was given.

The second element of fraud, knowledge of falsity, must also be regarded as established, since Rodney knew his own state of mind. From the same evidence which supports this finding, construing it generously, it can be inferred that Rodney intended that action be taken upon the basis of his promise.

But when we reach the question of reliance, we find neither evidence nor findings of fact to establish this vital element. The plaintiff father testified that he knew that one half of the gross income would be adequate to pay the expenses. If it proved not to be, it must have been the result of factors beyond the control of Rodney, since Rodney did not operate the ranch. As for the promise to operate the ranch, there is no testimony by either of the plaintiffs that they expected Rodney to do this. On the contrary, his mother testified that her understanding was that he was to continue at Nalley's. "He had his family to take care of,"

she said. Rodney's own testimony leaves little room for doubt that he expected to operate the ranch, if at all, only in the event of his father's death.

It must be borne in mind that it was the plaintiffs who were most familiar with the ranching business and who controlled the books of account. If Rodney's promises were irrational, they were in the best position to know it.

Not only did the plaintiffs fail to offer evidence that they relied upon the promises made by Rodney, other than his promises to allow them to live on the ranch and to retain its profits as long as they lived, but they had no right to rely on these promises if they reflected a misunderstanding of the relation of expenses to income. It was the plaintiffs who had superior knowledge, not their son and his wife.

■ In *Puget Sound Nat'l Bank v. McMahon, supra,* we said that the trier of the fact is justified in finding that the representee had no right to rely on a representation if he had expert knowledge and was peculiarly fitted and qualified by knowledge and experience to evaluate the truth or falsity of the representation. Here, there was no express finding that the plaintiffs had a *right* to rely on those promises of Rodney's which were extravagant, and such a finding, if made, would find no support in the record.

Proof being absent on this vital element of fraud, the trial court erred in finding that the defendants had defrauded the plaintiffs. We need not consider whether there is evidence to support a finding that the plaintiffs suffered damage because of the failure to keep the promises which were not kept, nor whether, as the defendant contends, the action is barred by the statute of limitations.

■ The real estate agent who took the acknowledgment of the deed testified that he understood that the purpose of the transfer was to avoid probate. There was no denial by any witness that this was the actual motive for the transfer. The agreement to allow the plaintiffs to live on the ranch and to treat the ranching business as their own is consistent with that purpose and is proven by the conduct of the parties over the years since the deed was

given. It amounts to ·an agreement by the grantees to convey back a life estate to the grantors.

■■ Such an agreement is required, by RCW 64.04.010 and 64.04.020, to be in writing, to be signed by the parties to be bound, and to be acknowledged. However, if there is a sufficient part performance, it may be proved without a writing. Under the doctrine of equitable estoppel by reason of part performance, certain acts referable to an oral agreement will be regarded as taking the agreement out of the statute of frauds, the problem in each case being to determine whether the facts are sufficient to have that effect. *Mobley v. Harkins*, 14 Wn.2d 276, 128 P.2d 289, 143 A.L.R.2d 88 (1942). The power of equity to disregard the statute should be exercised only where it is necessary to do so in order to prevent a gross fraud from being practiced. *Thompson v. Hunstad*, 53 Wn.2d 87, 330 P.2d 1007 (1958). As we said in that case, one of the requirements of the doctrine of part performance is that the acts relied upon as constituting part performance must unmistakably point to the existence of the claimed agreement, and if they can be accounted for by some other hypothesis, they are not sufficient.

The conduct of the parties here has been consistent with an agreement to allow the plaintiffs to continue to live upon the land and conduct their business thereon and enjoy its fruits throughout their lives, the kind of agreement which it is not unusual to expect children to make when their parents deed their land to them in their old age. The conduct of the parties points to no other reasonable hypothesis. To refuse the plaintiffs a decree establishing that right would indeed permit the perpetration of a fraud upon them. We do not suggest that defendant Mary Jean Beckendorf would be likely to breach the agreement. Her past conduct has shown that she respects it. But a successor to her interest might not be so scrupulous, and the rights of the plaintiffs can be fully protected only if a decree defining them is entered in this matter.

While the plaintiffs are not entitled to rescission for

fraud, they are entitled to a decree quieting title in each of them to a life estate in Mary Jean Beckendorf's half interest in the property.

The judgment is set aside and the cause remanded with directions to enter a decree accordingly.

HUNTER, C. J., HILL and NEILL, JJ., and DONWORTH, J. Pro Tem., concur.

October 6, 1969. Petition for rehearing denied.