[No. 9638–6–III. Division Three. December 19, 1989.]

PRESTON ADAMS, ET AL, *Appellants,* v. ALBERT ROBERT ALLEN, ET AL, *Respondents.*

384

*Keith Douglass* and *Kaiser, Douglass & Lewis,* for appellants.

*Robert Tenney* and *Meyer & Fluegge,* for respondents.

THOMPSON, C.J.—On July 30, 1986, Ruby and Preston Adams filed this medical malpractice action against Dr.

Albert Allen. They alleged that from 1974 until 1985 Dr. Allen negligently prescribed the painkillers Percodan and Percocet, failed to inform them of the side effects of the drugs, and fraudulently misrepresented the reasonableness of this course of treatment. As a result, they became addicted.

The Superior Court dismissed the claims for negligence and failure to inform, holding they were barred by the statute of limitation. It also dismissed the claim for fraudulent misrepresentation on the ground that the Adamses had not shown a genuine issue of material fact concerning the element of intentional wrongdoing or intent to deceive. The Adamses appeal.

We agree with the Superior Court's dismissal of the fraudulent misrepresentation claim, but we reverse in part the dismissal of the claims for negligence and failure to inform. We hold the statute of limitation does not bar the portion of these claims based on Dr. Allen's conduct in prescribing Percodan and Percocet for the Adamses within 3 years of the filing of their suit.

The affidavits and depositions relied upon by the Superior Court indicate that in 1973 Ruby Adams sought Dr. Allen's professional advice regarding lower back pain. He prescribed Percodan for her in January 1974. The written prescription stated the pills were to be taken every 6 to 8 hours as needed for pain, but Mrs. Adams testified that Dr. Allen orally advised her when she called complaining of flu symptoms that she could take the drug every hour without ill effects. Dr. Allen would give her two prescriptions for 100 tablets each when she came into the office for a checkup; he also gave some prescriptions over the phone. While she never told Dr. Allen that she was exceeding the written dosage recommendation, the documentary evidence shows that for many years Dr. Allen prescribed enough tablets to average a dosage of 5 to 6 pills per day.

Preston Adams begin using his wife's Percodan in 1974 for pain in his legs and feet. He later became a patient of Dr. Allen, and began obtaining prescriptions directly. Mr.

Adams does not recall Dr. Allen ever advising him of the side effects of Percodan. In contrast, Dr. Allen testified that he advised his patients of the possibility of drug dependency whenever he started prescribing Percodan. Mr. and Mrs. Adams were also prescribed Percodan on an occasional basis by Dr. William Fisher. Dr. Fisher advised Mr. Adams that Percodan was addictive. Neither Mr. nor Mrs. Adams told Drs. Fisher or Allen that they were receiving Percodan prescriptions from the other.

In 1975, Dr. Dale Peterson treated Mr. Adams for progressive impotency. He advised Mr. Adams that Percodan and alcohol might have something to do with his condition. Mr. Adams did not tell Dr. Peterson that he had been taking Percodan on a long–term basis.

In 1977, the couple's son, William Adams, first observed changes in his mother's behavior. He inventoried the drugs in his parents' possession, noting the Percodan which he knew from his law enforcement training to be a narcotic. When he expressed concern to his mother that Percodan was a dangerous drug, she responded that her doctor knew best. William called Dr. Fisher and told him he thought his mother was taking too much Percodan. He also attempted to call Dr. Allen, but apparently reached another doctor by the same last name. The Dr. Allen he contacted did not know what he was talking about.

In 1982, Mrs. Adams had a large portion of her stomach surgically removed. At this time, she admitted to Dr. Robert Rankin that she was "hooked" on Percodan. Percodan contains aspirin and likely contributed to Mrs. Adams' gastrointestinal problems. Her surgeon, Dr. James Brown, notified Dr. Fisher, the referring physician, that Mrs. Adams should be kept off Percodan. In his opinion, Percodan should not be used for anything other than very short–term acute pain. He stated refills should not be given. According to Dr. Rankin, he monitored prescriptions for Percodan in his own practice beginning in the early 1970's.

In his view, most patients who abuse Percodan do not recognize that it is addictive. Instead, they believe it is the only remedy for their pain.

Following Mrs. Adams' surgery, Dr. Allen switched both Mr. and Mrs. Adams to Percocet, which contains the same narcotic as Percodan, but does not contain aspirin. Dr. Allen last prescribed Percocet for the Adamses in March 1985. The next month, Mrs. Adams was hospitalized for a severe kidney infection. Mrs. Adams underwent treatment for drug abuse in April 1985; her husband entered the same program in May 1985. They filed suit in July 1986.

Mrs. Adams testified that she never admitted to herself that she had to get off Percodan until April 1985. In retrospect, she believes she was addicted as early as 1974. Mr. Adams testified that he began to suspect that he was dependent on the medication in 1983 or 1984.

Douglas Ragland, M.D., an expert retained by the Adamses, attested:

> The medical records indicate that Ruby Adams was advised once in March of 1982 to discontinue the OXYCODONE HCl [Percodan] medication. This advice was given around the time of her surgery for bleeding ulcer and bowel obstruction. The effect of OXYCODONE HCl and other pre–operative, operative, and post–operative medications on Ruby Adam[s'] mental competence was not ascertained prior [to] giving this advice. I found no evidence in the medical record that Ruby or Preston Adams were fully advised of their addiction to OXYCODONE HCl at this time or the consequences of continued use of this medication. . . .
>
> Based upon my review of the medical records pertinent to this case, it is my medical opinion that Ruby Adams and Preston Adams did not fully comprehend the nature or extent of their addiction between 1982 and 1985. During this time interval the Adams[es] were not capable of or competent to act on the advi[c]e in 1982 to discontinue OXYCODONE HCl without the support of their primary physician . . . or the structure of an in–patient or out–patient drug treatment program.
>
> . . . .
>
> Dr. Allen continued to prescribe OXYCODONE HCl to the Adams[es] between 1982 and 1985. Each and every subsequent prescription of OXYCODONE HCl after 1982 more probably

than not aggravated the Adams[es'] addiction to this medication increasing the duration and severity of this addiction and reducing the likelihood of successful long term withdrawal from this narcotics addiction.

Between 1982 and 1985, Dr. Allen failed to disclose to the Adams[es] the full nature and extent of their addiction to OXYCODONE HCl. Reasonable treatment options were not discussed with the Adams[es] and their addiction was prolonged and worsened by Dr. Allen in clear violation of Washington law governing the conduct of physicians in these circumstances.

Dr. Allen's motion for summary judgment was based on former RCW 4.16.350 which read:[1]

Any civil action for damages for injury occurring as a result of health care which was provided after June 25, 1976 against:

(1) A person licensed by this state to provide health care or related services, including, but not limited to, a physician . . ..

. . . .

based upon alleged professional negligence *shall be commenced within three years of the act or omission alleged to have caused the injury or condition,* or one year of the time the patient or his representative discovered or reasonably should have discovered that the injury or condition was caused by said act or omission, whichever period expires later . . ..

(Italics ours.) Laws of 1975, 2d Ex. Sess., ch. 56, § 1.

The Superior Court held:

Based upon my review of the depositions in this case, . . . I have concluded that the plaintiffs knew that they were addicted to the medication Percodan clearly as early as 1977 or '78 and again told in 1982. Given the fact that in the state of Washington there is no longer a continuing course of conduct or continuing tort doctrine as established in *Bixler v. Bowman,* 94 Wn. 2d 146 [614 P.2d 1290 (1980)] and *Doyle v. Planned Parenthood [of Seattle–King Cy., Inc.],* 31 Wn. App. 126 [639 P.2d 240 (1982)]; the Court concludes that under the provisions of R.C.W. 4.16.350 this case, which was commenced July 30, 1986, is beyond the three year statutory period as well as the one year period.

We distinguish *Bixler v. Bowman,* 94 Wn.2d 146, 614 P.2d 1290 (1980) on its facts and reach a different result

---

[1]The Legislature amended RCW 4.16.350 in 1986 and 1987. Laws of 1986, ch. 305, § 502; Laws of 1987, ch. 212, § 1401. However, the portion of the statute quoted here was not changed significantly.

here as to the alleged acts of malpractice that occurred within 3 years of filing this lawsuit.

The Supreme Court announced the continuing course of treatment rule in *Samuelson v. Freeman,* 75 Wn.2d 894, 454 P.2d 406 (1969). There, the alleged malpractice occurred in surgery in September 1960, but the physician continued to treat the plaintiff until April 1963. The plaintiff filed suit in April 1964. *Samuelson,* at 900, held:

> In construing the statute of limitations concerning medical malpractice, we think it a sound rule that, if malpractice is claimed during a continuous . . . course of treatment for a particular illness or condition, the statute does not begin to run until the treatment for that particular illness or condition has been terminated.

In 1971, the Legislature enacted RCW 4.16.350, a statute of limitation specifically governing medical malpractice actions. When the Supreme Court reviewed the continuing course of treatment rule in the context of RCW 4.16.350, it concluded that the statute modified the rule. *Bixler.* The court held at page 150 that "[t]he concept of the termination of a 'continuing course of treatment' has been succeeded by the designation of a 'date of the alleged wrongful act'." *See also Doyle v. Planned Parenthood of Seattle–King Cy., Inc.,* 31 Wn. App. 126, 639 P.2d 240 (1982); *Olson v. Siverling,* 52 Wn. App. 221, 227, 758 P.2d 991 (1988), *review denied,* 111 Wn.2d 1033 (1989).

In *Bixler,* the plaintiff had consulted the defendant doctor in January and in April 1975 about a lump in her breast. He advised self–examination. In August, she consulted another doctor who immediately diagnosed her problem as a malignant tumor. By that time, the cancer had spread to both breasts. She sued in June 1978, and argued that the statute of limitation had not begun to run until August 1975 when she went to the second doctor. The court disagreed and held that the alleged wrongful act occurred in April 1975, when the defendant misdiagnosed the plaintiff's condition.

*Bixler* involved one wrongful act, the misdiagnosis. That situation is distinguished from one wherein a doctor

repeats a negligent treatment throughout his relationship with his patient. In the latter instance a doctor is not insulated from liability simply because the first of the repeated wrongful acts occurred more than 3 years before the patient sued. *Bixler*'s progeny was distinguished in *Comstock v. Collier,* 737 P.2d 845, 850 n.7 (Colo. 1975):

> Most medical negligence cases specifically rejecting theories of continuous treatment involve a single, allegedly negligent act with no further contact between the physician and patient. *See, e.g., Doyle v. Planned Parenthood,* 31 Wash.App. 126, 639 P.2d 240 (1982) ("alleged wrongful act" triggering statute of limitation was insertion of IUD, not later failure to warn, where there was no continuing treatment); . . ..

Here, Dr. Allen *continued* to prescribe Percodan and Percocet to the Adamses until March 1985, only 16 months before they filed this action. Under similar facts, other jurisdictions have refused to hold that the statute of limitation bars a patient's malpractice action. *See Oakes v. Gilday,* 351 A.2d 85 (Del. Super. Ct. 1976) (in medical malpractice action based on defendant doctor's alleged failure to warn patient of side effects of prescribed drug, doctor's duty to warn was breached *each* time patient submitted to treatment without proper consent); *Ballenger v. Crowell,* 83 N.C. App. 50, 247 S.E.2d 287, 16 A.L.R.4th 989 (1978) (statute of limitation did not bar 1976 action alleging defendant had caused and maintained plaintiff's addiction to drugs from 1962 until 1974); Annot., *Physician's Liability for Causing Patient To Become Addicted to Drugs,* 16 A.L.R.4th 999 (1982); *cf. Bikowicz v. Nedco Pharmacy, Inc.,* 114 A.D.2d 708, 494 N.Y.S.2d 541 (1985) (plaintiff's 1981 action barred because her physician had not been consulted about refills on the narcotic prescription after 1977).

Each time a prescription was written by Dr. Allen, allegedly in excessive quantities and/or without informing the Adamses of the risks, it was a separate wrongful act for purposes of the statute of limitation. Some prescriptions were provided within the 3 years preceding the Adamses'

action. We therefore reverse the entry of summary judgment as to that portion of the Adamses' action based on acts occurring within 3 years of the filing of their suit.[2] If the Adamses can prove negligence and/or failure to inform, they may recover damages caused *during that time period,* but not before.[3] These damages would include injury to the Adamses' health and their ability to enjoy life caused by their addiction after July 30, 1983.

█ The Adamses' action raises other issues, but they involve questions of material fact and, thus, are not appropriate for summary judgment. For example, did they consent to Dr. Allen's alleged negligence by continuing to seek treatment from him? Dr. Allen refers us to the exception to the continuing course of treatment rule, *i.e.,* the rule does not apply to benefit the plaintiff if he knew or should have known of the alleged medical malpractice before he terminated treatment with the defendant physician. *Samuelson,* at 900–01. The facts here do not fit within the exception. Again, the alleged wrongful act of Dr. Allen was repeated through March 1985. Therefore, the issue is not simply whether the Adamses knew or should have known they were addicted. Rather, the issue is whether they were competent to consent to the further acts of alleged malpractice occurring within the limitation period. Dr. Ragland's affidavit raises an issue of material fact in this regard. There

---

[2]The Adamses are not barred by the 1–year discovery rule; the statute provides that the limitation period is 3 years from the negligent act or 1 year from discovery, "whichever period expires *later.*" (Italics ours.) RCW 4.16.350.

[3]In this context, we note again Dr. Ragland's assertion in his affidavit, quoted above, that *each* prescription for the narcotic "more probably than not" aggravated the Adamses' addiction, increased its duration and severity, and reduced the likelihood of successful long–term withdrawal.

We do not accept Dr. Allen's argument that "aggravation" of the injury is not a "new" injury. The Adamses' situation is different from that of the plaintiff in *Steele v. Organon, Inc.,* 43 Wn. App. 230, 716 P.2d 920, *review denied,* 106 Wn.2d 1008 (1986), which Dr. Allen cites. In *Steele,* there was a single wrongful act, but the extent of the injury from that wrongful act was not revealed fully until many years later. As we have held, the alleged wrongful act here was repeated during the limitation period and may have aggravated the injury.

also exist issues concerning whether the amount of Percocet Dr. Allen prescribed was excessive and whether he informed the Adamses of the risks.

The Adamses' third cause of action is for fraudulent misrepresentation. They contend that Dr. Allen, by prescribing Percodan and Percocet over an extended period of time, represented to them that this was a safe and appropriate course of treatment. The Superior Court dismissed the cause of action, holding that the Adamses had not shown a genuine issue of material fact concerning the element of intentional wrongdoing or intent to deceive. We agree.

Generally, "[f]or deceit there must be proof 'that a false representation has been made (1) knowingly, or (2) without belief in its truth, or (3) recklessly, careless whether it be true or false.'" W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on Torts* § 107, at 740 (5th ed. 1984) (quoting Lord Herschell in the case of *Derry v. Peek,* 14 A.C. 337, 374 (H.L. 1889)). Washington cases also hold that intent to deceive is an essential element of fraud. *See Hoffer v. State,* 110 Wn.2d 415, 425, 755 P.2d 781 (1988), *aff'd on rehearing,* 113 Wn.2d 148, 776 P.2d 963 (1989); *McRae v. Bolstad,* 101 Wn.2d 161, 167, 676 P.2d 496 (1984); *Beckendorf v. Beckendorf,* 76 Wn.2d 457, 462, 457 P.2d 603 (1969). In *Brown v. Underwriters at Lloyd's,* 53 Wn.2d 142, 145, 332 P.2d 228 (1958), the court quoted *Dunlap v. Seattle Nat'l Bank,* 93 Wash. 568, 576, 161 P. 364 (1916): "If, when all the facts and circumstances are taken together, they are consistent with an honest intent, proof of fraud is wanting.'"

Nevertheless, the Adamses rely on two cases that suggest that an honest mistake is enough to support the intent element of fraud. *Pratt v. Thompson,* 133 Wash. 218, 233 P. 637 (1925); *Western Lumber, Inc. v. Aberdeen,* 10 Wn.

App. 325, 327, 518 P.2d 745 (1973), *review denied,* 83 Wn.2d 1009 (1974). In *Pratt,* the defendant, in selling land to the plaintiff, innocently misrepresented that a spring was located on the property being sold. In *Western Lumber,* the plaintiff sought to recover overpayments it had made to the City for water over a period of 12 years. The City's water bills were in error, albeit innocently, because there was an extra meter on the plaintiff's water line. Both cases are distinguishable. Although they do not cite Restatement (Second) of Torts § 552C, at 141 (1977), *Pratt* and *Western Lumber* are representative of the rule set forth there:

> (1) One who, *in a sale, rental or exchange transaction* with another, makes a misrepresentation of a material fact for the purpose of inducing the other to act or to refrain from acting in reliance upon it, is subject to liability to the other for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation, even though it is not made fraudulently or negligently.
> (2) Damages recoverable under the rule stated in this section are limited to the difference between the value of what the other has parted with and the value of what he has received in the transaction.

(Italics ours.) No "sale, rental or exchange transaction" occurred here.

■ The Adamses also contend that the record contains evidence of deceit sufficient to withstand the motion for summary judgment. We disagree. Each element of fraud must be proven by evidence that is clear, cogent and convincing. *Beckendorf,* at 462. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 91 L. Ed. 2d 202, 106 S. Ct. 2505, 2513 (1986). So viewed, the evidence here does not raise an issue that Dr. Allen acted with intent to deceive.

The summary dismissal of the causes of action for negligence and failure to inform is reversed in part; the dismissal of the action for fraudulent misrepresentation is affirmed.

GREEN and MUNSON, JJ., concur.