[No. 53549-3.   En Banc.   May 12, 1988.]

ARTHUR HOFFER, ET AL, *Appellants,* v. THE STATE
OF WASHINGTON, ET AL, *Respondents.*

*McKay & Gaitan,* by *Michael D. McKay, James E. Niemer,* and *James R. Hennessey; Berger & Steingut,* by *Charles S. Webb III, Stanley Steingut, Theodore S. Steingut,* and *Lawrence A. Mandelker* (*Douglass A. North, Hennings, Maltman, Weber & Reed, Carol Porell Cocheres, Eckert, Seamans, Cherin & Mellott,* and *Cornelius J. Peck,* of counsel), for appellants.

*Kenneth O. Eikenberry, Attorney General, James K. Pharris, Senior Assistant,* and *Robert J. Fallis, Assistant,* for respondents.

DURHAM, J.—This case, like others before it, arises out of the construction of nuclear power plants by the Washington Public Power Supply System (Supply System). Financing for these projects came from the sale of revenue bonds to the investing public. These bondholders have sued the State to recover the $7.5 billion that they have been unable to collect on their bonds after the Supply System defaulted.

The bondholders' allegations focus primarily on the State Auditor's failure to inform them of weaknesses in their investments, such as the true extent of the Supply System's financial difficulties and the unconstitutionality of the bonds' security arrangement. The trial judge dismissed the bondholders' complaint under CR 12(b)(6) because of its failure to state claims upon which relief could be granted. We affirm the dismissal of the unjust enrichment claim, but we reverse the trial court as to each of the other claims.

In 1957, 18 Washington municipal corporations organized the Supply System to serve as a construction and financing vehicle for power–generating projects beyond the capacity of any single utility. In the 1970's, the Supply System undertook construction of five nuclear power plants. This case involves two such projects, WNP 4 and WNP 5. These projects were financed through a series of revenue bond sales. The revenue bonds were all embossed with a certificate from the State Auditor, which read as follows:

I Do Hereby Certify that I have examined the within Bond and certified copies of the resolutions authorizing the issuance thereof, and such additional information with respect thereto as is required by me, and that the within Bond has been registered in my office in accordance with the provisions of Section 54.24.070 of the Revised Code of Washington.

The security for WNP 4 and WNP 5 was provided by 88 "Participants", consisting of cities, utility districts and rural cooperatives from around the Northwest. Under the Participants' Agreement, the Supply System promised to sell, and the Participants promised to buy, blocks of energy capacity. The Participants also promised to unconditionally repay the Supply System for the costs of WNP 4 and WNP 5, including debt service, even if the plants never produced energy.

Between 1976 and 1980, as construction of the plants progressed, the Supply System issued annual reports containing the following letter from the State Auditor:

To Whom it May Concern:

The Washington State Auditor's Division of Municipal Corporation conducts a continuous examination of all of the operations of the Washington Public Power Supply System, including each and every project. Reports are issued covering each fiscal year, and are public documents.

On every such examination, state law requires that inquiry shall be made as to the financial condition and resources of the Supply System, whether the Constitution and laws of the state, the resolutions and orders of the Supply System, and the requirements of the Division of Municipal Corporations have been properly complied with; and into the methods and accuracy of the accounts and reports.

Very truly yours,
Robert V. Graham, State Auditor

Financial problems surrounding the construction of WNP 4 and WNP 5 worsened in the early 1980's. The last set of bonds was issued on March 17, 1981. Approximately two months later, the Supply System's management recommended that a moratorium be placed on construction of these plants. The Supply System eventually terminated these projects on January 22, 1982.

With the termination of WNP 4 and WNP 5, the bond obligations to the bondholders could no longer be repaid from revenue generated by the plants' operation. In the event of termination, the Participants' Agreement called for the Participants to begin making payments on the bonds' debt service 1 year after the date of termination. However, the majority of the Participants withheld payments at that time. The trustee for the bondholders thereupon instituted a declaratory action to determine that the Participants were liable for debt service under the Participants' Agreement. This court held that none of the Participants were obligated to pay, concluding that the Washington municipalities and public utility districts lacked authority to enter into the Agreement, *Chemical Bank v. WPPSS,* 99 Wn.2d 772, 666 P.2d 329 (1983), and we subsequently released the remaining Participants from liability under the doctrines of

mutual mistake and commercial frustration. *Chemical Bank v. WPPSS,* 102 Wn.2d 874, 691 P.2d 524, *cert. denied,* 471 U.S. 1065 (1984).

Thwarted in their attempts to hold the Participants to their obligations, the bondholders sought other avenues of recovery. In addition to the present case against the State, the bondholders also initiated *Haberman v. WPPSS,* in which they sued the Supply System, the Participants, and a number of professionals for alleged fraud and misrepresentations in the sale of the revenue bonds. We recently remanded *Haberman* for further proceedings in the trial court after holding that some of the plaintiff's claims had been erroneously dismissed under CR 12(b)(6). *Haberman v. WPPSS,* 109 Wn.2d 107, 178, 744 P.2d 1032, 750 P.2d 254 (1987).

Pursuing another avenue of recovery, the bondholders initiated the present case against the State of Washington. The bondholders alleged 12 separate causes of action against the State, all of which were dismissed by the trial judge under CR 12(b)(6) for failure to state claims upon which relief could be granted. The bondholders have not appealed the dismissal of three of these claims,[1] leaving the following nine claims before us:

1–4. That the State Auditor negligently performed or failed to perform his statutory duties of auditing the Supply System and examining the bond resolutions;

5. That the State Auditor's letter and his certification of the bonds both contained fraudulent misrepresentations;

6. That these same writings contained negligent misrepresentations;

7. That under The Securities Act of Washington (WSSA), RCW 21.20, the State is liable for the untrue statements in the Auditor's two writings and is secondarily liable for untrue statements made by the Supply System in connection with the bond sales;

---

[1]These three claims sought recovery under theories of moral obligation, estoppel by recital and improper financing scheme.

8. That the State's participation in the Supply System's decision to terminate WNP 4 and WNP 5 constituted tortious interference with the contractual relations between the Supply System and the bondholders;

9. That the State has been unjustly enriched at the expense of the bondholders.

STANDARD OF REVIEW

Under CR 12(b)(6), a complaint can be dismissed if it fails to state a claim upon which relief can be granted. Because a trial court's dismissal under this rule is a holding on a question of law, appellate review is de novo. *Guillory v. County of Orange,* 731 F.2d 1379, 1381 (9th Cir. 1984).

■ Courts should dismiss a claim under CR 12(b)(6) only if "'it appears beyond doubt that the plaintiff can prove no set of facts, consistent with the complaint, which would entitle the plaintiff to relief.'" *Orwick v. Seattle,* 103 Wn.2d 249, 254, 692 P.2d 793 (1984) (quoting *Corrigal v. Ball & Dodd Funeral Home, Inc.,* 89 Wn.2d 959, 961, 577 P.2d 580 (1978)). Under this rule, a plaintiff's allegations are presumed to be true. *Lawson v. State,* 107 Wn.2d 444, 448, 730 P.2d 1308 (1986); *Bowman v. John Doe,* 104 Wn.2d 181, 183, 704 P.2d 140 (1985). Moreover, a court may consider hypothetical facts not part of the formal record. *Halvorson v. Dahl,* 89 Wn.2d 673, 675, 574 P.2d 1190 (1978). Therefore, a complaint survives a CR 12(b)(6) motion if *any* set of facts could exist that would justify recovery. *Lawson,* at 448; *Bowman,* at 183.

As a practical matter, a complaint is likely to be dismissed under CR 12(b)(6) "only in the unusual case in which plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief." 5 C. Wright & A. Miller, *Federal Practice* § 1357, at 604 (1969). For the foregoing reasons, CR 12(b)(6) motions should be granted "'sparingly and with care.'" *Orwick,* at 254 (quoting 27 Federal Procedure *Pleadings and Motions* § 62:465 (1984)).

Furthermore, our task is to determine only if there is any possible set of facts for each claim under which recovery could be granted. In many instances the bondholders have alleged multiple theories under which they could recover under a single claim. Once we have determined that recovery for a single claim is possible under one theory or set of facts, we will not address the sufficiency of the other theories. Accordingly, we have not addressed all the parties' arguments concerning each claim.

### AUDITOR'S STATUTORY DUTIES

The bondholders' complaint includes four separate claims alleging that the Auditor violated his statutory duty to audit the Supply System. The bondholders allege that the Auditor had a duty to: (1) audit the authority of the cities and public utility districts to enter into the Participants' Agreement; (2) to *properly* audit the same authority; (3) to audit the legal requirements of the bond resolution and the Supply System's issuance of the bonds; and (4) to *properly* audit the same items.

These claims sound in negligence, for which the elements are duty, breach of duty, proximate causation, and resulting injury. *Alger v. Mukilteo*, 107 Wn.2d 541, 545, 730 P.2d 1333 (1987). The State Auditor's duties in this case arose from two separate statutory sources. First, RCW 43.09.260 required the Auditor to audit the Supply System and other public offices. Furthermore, standard governmental accounting principles allegedly required that audit to extend to underlying security mechanisms such as the Participants' Agreement. Second, former RCW 54.24.070 required the Auditor to examine and register the Supply System's revenue bonds before they were issued.

The State argues that these negligence claims were properly dismissed under CR 12(b)(6) on two theories: (1) the public duty doctrine, and (2) a lack of legal causation. We first address the public duty doctrine. Under that doctrine, the State cannot be held liable for tortious acts of its officials if that liability is based on a duty owed to the public

generally. *See J & B Dev. Co. v. King Cy.*, 100 Wn.2d 299, 303, 669 P.2d 468, 41 A.L.R.4th 86 (1983). Putting it another way, "a duty to all is a duty to no one". *J & B Dev. Co.*, at 303. In order to avoid application of this doctrine, a plaintiff must show that the duty breached was owed to him individually rather than to the general public. *J & B Dev. Co.*, at 303.

The first question to be answered is if the doctrine applies at all to this case. In the related case of *Haberman v. WPPSS*, this court recently refused to apply the doctrine to the Supply System itself. We concluded that the doctrine was not applicable because the Supply System was not engaged in a public service, but rather was raising private funds for public use. *Haberman v. WPPSS*, 109 Wn.2d 107, 158, 744 P.2d 1032, 750 P.2d 254 (1987). Furthermore, the Supply System acted pursuant to the securities laws, applicable to all, rather than pursuant to a public duty. *Haberman*, at 158. The *Haberman* holding reflects the theory that the public duty doctrine is inapplicable when the State engages in proprietary acts. *See Bailey v. Forks*, 108 Wn.2d 262, 268, 737 P.2d 1257 (1987), discussing *Petersen v. State*, 100 Wn.2d 421, 671 P.2d 230 (1983).

However, the proprietary aspects of the Supply System's activity in *Haberman* are not to be found in the Auditor's acts involved in the present case. A government acts in a proprietary capacity "when it engages in a business–like venture as contrasted with a governmental function." Black's Law Dictionary 1097 (5th ed. 1979). The Supply System's fundraising activity was essentially a commercial venture. Furthermore, the Supply System acted pursuant to the generally applicable securities laws rather than any uniquely governmental duties. In the present case, however, the Auditor was acting pursuant to noncommercial and uniquely governmental duties. Only governmental officials are charged with auditing public offices and with the registration of securities. Therefore, the Auditor's acts were not proprietary in nature and the public duty doctrine is applicable to this case.

However, before concluding that dismissal on that basis was correct, we must determine if any of the public duty doctrine's exceptions are relevant. Four exceptions to the public duty doctrine exist: legislative intent, failure to enforce, the rescue doctrine and special relationship. *Bailey*, at 268. It is only the last of these that appears applicable. Under the special relationship exception, the State is open to liability:

> where a relationship exists between the governmental agent and any reasonably foreseeable plaintiff, setting the injured plaintiff off from the general public and the plaintiff relies on explicit assurances given by the agent or assurances inherent in a duty vested in a governmental entity . . .

*Bailey*, at 268.

In the present case, a special relationship was arguably created through the State Auditor's letter, at least for purposes of CR 12(b)(6). First, the bondholders have alleged that the Auditor intended for the letter to reach current and future bondholders, or at least knew that it was being so used, through its inclusion in the Supply System's annual reports. If this allegation is assumed to be true, then the bondholders were reasonably foreseeable plaintiffs. Second, the same allegations show that the relationship set the bondholders off from the general public. Finally, the letter could plausibly be interpreted by its readers to contain implicit assurances. The entire thrust of the letter appears to be an assurance that the Auditor was familiar with the Supply System's finances and that everything was in order. The interpretation of a written document must include not only analysis of the language used, but also the document's intended objective and the effect the language would produce, under the circumstances, upon the ordinary mind. *Clausing 'v. DeHart*, 83 Wn.2d 70, 75–76, 515 P.2d 982 (1973); W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on Torts* § 106 (5th ed. 1984); *Central Hanover Bank & Trust Co. v. Commissioner*, 159 F.2d 167, 169 (2d Cir.), *cert. denied sub nom. Estate of Wilkinson v.*

*Commissioner,* 331 U.S. 836 (1947). Because the surrounding circumstances have not yet been established factually, it would be premature to resolve this issue on a CR 12(b)(6) motion. Even though the letter does not include an explicit assurance, the bondholders should be allowed the opportunity to present evidence concerning the letter's objective, and the effect that the letter would produce on the ordinary reader. For the foregoing reasons, the public duty doctrine does not bar the bondholders' claims at this preliminary stage of the proceedings.

The other issue relied upon by the State to support the dismissal of plaintiffs' claims is proximate causation. The State argues that the Auditor's acts were too remote from the bondholders' damage to be considered as a legal cause. The bondholders contend, however, that the Auditor's failure to warn them led directly to their purchasing or retaining bonds and to their eventual losses. In order to constitute proximate cause, "negligent conduct must cause in a direct sequence, unbroken by any independent cause, the injury complained of." *Alger v. Mukilteo,* 107 Wn.2d 541, 545, 730 P.2d 1333 (1987). Arguably, two intervening causes might have broken the causal connection between the Auditor's failure to warn and the bondholders' damages, namely the default of the Supply System and this court's opinion releasing the Participants from their post–default obligations. However, these intervening events were not necessarily independent of the Auditor's own acts, because the Auditor's failure to warn allegedly related to the likelihood that these very events would occur. Accordingly, the proximate cause issue does not justify dismissing the bondholders' statutory duty claims on a CR 12(b)(6) motion.

## FRAUDULENT MISREPRESENTATION

The bondholders allege that the Auditor made fraudulent misrepresentations in the letter that appeared in the Supply System's annual reports. Once again, the body of

that letter reads as follows:

> The Washington State Auditor's Division of Municipal Corporations conducts a continuous examination of all of the operations of the Washington Public Power Supply System, including each and every project. Reports are issued covering each fiscal year, and are public documents.
>
> On every such examination, state law requires that inquiry shall be made as to the financial condition and resources of the Supply System, whether the Constitution and laws of the state, the resolutions and orders of the Supply System, and the requirements of the Division of Municipal Corporations have been properly complied with; and into the methods and accuracy of the accounts and reports.

The bondholders contend that the second paragraph contains the following misrepresentations: that the Supply System's financial statements and reports were accurate; that the Supply System's operations and financial condition were sound; and that that the Participants' Agreement was valid and enforceable.

In order to prove fraudulent misrepresentation at trial, the bondholders will have to establish the following elements:

1. Representation of an existing fact
2. Materiality
3. Falsity
4. Speaker's knowledge of its falsity
5. Speaker's intention that it shall be acted upon by the plaintiff
6. Plaintiff's ignorance of falsity
7. Reliance
8. Right to rely
9. Damages

*Beckendorf v. Beckendorf,* 76 Wn.2d 457, 462, 457 P.2d 603 (1969); *North Pac. Plywood, Inc. v. Access Rd. Builders, Inc.,* 29 Wn. App. 228, 232, 628 P.2d 482, *review denied,* 96 Wn.2d 1002 (1981).

We now examine these elements in order, beginning with the first three elements, stressing again the unique deference we must give plaintiff's claimed facts and inferences under a CR 12(b)(6) motion. Did the letter contain false and material statements about existing facts? The State argues that falsity is lacking because the statements were accurate descriptions of the Auditor's statutory duty to audit the Supply System under RCW 43.09.260. The State's argument is unpersuasive for two reasons. First, the description is not fully accurate. For example, the relevant statute, RCW 43.09.260, by no means requires that the Auditor's examination of the Supply System be "continuous", as the letter represents.[2] Second, the State's argument ignores the possibility that the letter made implicit representations over and above the explicit representations concerning statutory duties. A reasonable investor, depending on the circumstances, might have interpreted the letter as representing that the Auditor had uncovered no weaknesses in the investment. As we discussed above with

---

[2]RCW 43.09.260 provides in relevant part as follows:

"The state auditor, the chief examiner, and every state examiner shall have power by himself or by any person legally appointed to perform the service, to examine into all financial affairs of every public office and officer.

"The examination of the financial affairs of all taxing districts shall be made at such reasonable, periodic intervals as the state auditor shall determine. However, an examination of the financial affairs of all taxing districts shall be made at least once in every three years. The term 'taxing districts' for purposes of RCW 43.09-.190 through 43.09.285 includes but is not limited to all counties, cities, and other political subdivisions, municipal corporations, and quasi-municipal corporations, however denominated.

"The state auditor shall establish a schedule to govern the auditing of taxing districts which shall include: A designation of the various classifications of taxing districts; a designation of the frequency for auditing each type of taxing district; and a description of events which cause a more frequent audit to be conducted.

"On every such examination, inquiry shall be made as to the financial condition and resources of the taxing district; whether the Constitution and laws of the state, the ordinances and orders of the taxing district, and the requirements of the division of municipal corporations have been properly complied with; and into the methods and accuracy of the accounts and reports."

regard to the public duty doctrine, whether the letter contains such implicit representations requires the development of more facts. It is certainly possible that these implicit representations were false and material, there being nothing before us to indicate to the contrary. Thus, facts may exist with which the bondholders could prove the first three elements of fraudulent misrepresentation.

■ Turning to the remaining elements, the bondholders' allegations as to intent, knowledge, and reliance must be accepted as true, there being nothing in the complaint to contradict them. Therefore, elements 4 through 7 are met. The State has argued that element 8, right to rely, is not met because the bondholders could have discovered the truth about the Supply System's condition by reading the Auditor's published audit reports. However, as a general rule, fraud is still recoverable even if a search of public records could have revealed the truth. *See North Pac. Plywood, Inc. v. Access Rd. Builders, Inc., supra* at 233; *Boonstra v. Stevens–Norton, Inc.,* 64 Wn.2d 621, 626, 393 P.2d 287 (1964). This rule applies with even greater force in the current case because we do not know how accessible those audit reports were to the bondholders. Finally, there is no dispute that the bondholders suffered damage.

Because the bondholders may be able to prove that the letter satisfied all nine elements of fraud,[3] we conclude that the bondholders' claim for fraudulent misrepresentation survives the State's CR 12(b)(6) motion.

### NEGLIGENT MISREPRESENTATION

■ The bondholders argue that the statements in the letter that we have just discussed also constituted negligent misrepresentations. In such claims, this court follows the standards set out in the second Restatement of Torts. *Haberman v. WPPSS,* 109 Wn.2d 107, 161–62, 744 P.2d

---

[3]Because of our holding that relief could possibly be granted for intentional misrepresentations in the letter, we need not also address whether the Auditor's certificate might also contain intentional misrepresentations.

1032, 750 P.2d 254 (1987); *Transamerica Title Ins. Co. v. Johnson,* 103 Wn.2d 409, 415–16, 693 P.2d 697 (1985). Those standards are as follows:

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

(a) by the person or one of the limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

Restatement (Second) of Torts § 552 (1977).

For purposes of CR 12(b)(6), the bondholders' allegations are sufficient to satisfy the first subsection of this standard. The State Auditor was acting in the course of his employment when he wrote the letter and we have already discussed how the letter might have reasonably been interpreted to contain false information. The bondholders further allege that they relied on the letter and that the Auditor did not exercise reasonable care in obtaining the information being communicated, causing their pecuniary loss. Finally, the justifiability of the bondholders' reliance is a factual issue that cannot be resolved on a CR 12(b)(6) motion, for the same reasons as discussed above with regard to fraudulent misrepresentations. These allegations

are not contradicted anywhere else in the complaint and are sufficient to make out a claim under subsection (1).

Moreover, the limitations of subsection (2) do not bar the bondholders' negligent misrepresentation claim. The bondholders have alleged that the Auditor wrote the letter knowing that the Supply System intended for it to reach investors who were deciding whether to purchase bonds. If these facts are proved, then subsection (2) would not bar the bondholders' claim.

Finally, subsection (3) does not preclude relief. That subsection by its terms allows a cause of action only when the loss is suffered by any of the class of persons for whose benefit the duty is created. This subsection is premised on the idea that only this one exception to the public duty doctrine exists. However, the law in this state establishes other exceptions, including one for special relationships. A plaintiff should be able to recover for negligent misrepresentations if he can both establish the existence of a special relationship and meet the requirements of subsections (1) and (2) of the above standards. Because the bondholders have established this much in the current case, at least for purposes of CR 12(b)(6), they have stated a remediable claim of negligent misrepresentation.

## THE SECURITIES ACT OF WASHINGTON (WSSA)

The bondholders have alleged that the State is liable under WSSA, RCW 21.20. Under that act, civil liability can be imposed. RCW 21.20.430(1)–(3). In the first situation, "[a]ny person, who offers or sells a security in violation of any provisions of RCW 21.20.010 or 21.20.140 through 21.20.230, is liable to the person buying the security from him or her . . ." RCW 21.20.430(1).

■ The State argues that this subsection imposes liability only on defendants who were in strict privity with the plaintiffs. Consequently, the State contends that it cannot be held liable because it did not sell the bonds directly to the bondholders. However, we rejected this "strict privity" interpretation in *Haberman. Haberman*, at 124–33. In its place, we adopted the "substantial factor—proximate

cause" analysis formulated by the federal courts in construing a similarly worded federal statute. This analysis extends liability beyond the direct seller to include defendants who were "a substantial contributive factor in the sales transaction". *Haberman*, at 131. Whether a defendant's conduct is a substantial contributive factor depends upon:

(1) the number of other factors which contribute to the sale and the extent of the effect which they have in producing it; (2) whether the defendant's conduct has created a force or series of forces which are in continuous and active operation up to the time of the sale, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible; and (3) lapse of time.

*Haberman*, at 131. This test necessarily involves many factual issues that cannot be resolved on this CR 12(b)(6) motion, because the bondholders' allegations do not address these factors. Determination of the Auditor's status as a seller under RCW 21.20.430(1) requires the development of more facts.[4] Therefore, we conclude that the State could still possibly be held liable as a "seller" under RCW 21.20-.430(1).

One additional issue under RCW 21.20.430(1) requires analysis. A "seller" is liable under that section only if he violates RCW 21.20.010 or RCW 21.20.140 through 21.20-.230. At issue in the present case is RCW 21.20.010, which provides in relevant part that:

It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly:

. . .

---

[4]Indeed, if we were to hold that we could determine the Auditor's status as a seller on these facts, it would be inconsistent with our decision in *Haberman*. In *Haberman*, we did not decide if the professional defendants, including accountants, qualified as sellers. Instead, we concluded that this issue was factual in nature, *Haberman*, at 131–32, thereby precluding resolution in a CR 12(b)(6) proceeding. The Auditor's role in the present case is similar to that of the professional accountants in *Haberman*, both having auditing duties. Accordingly, we decline to decide if the Auditor was a seller in the present case.

(2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading . . .

We have already discussed the possibility that untrue statements of material fact might have been made in the Auditor's letter, at least for purposes of CR 12(b)(6). See section on fraudulent misrepresentations above. Furthermore, the letter was arguably issued "in connection with" the sale of the bonds, having been placed in the Supply System's annual reports, allegedly to influence conduct of actual and potential bondholders. Thus, the State might have violated RCW 21.20.010, and we cannot conclude that the bondholders are foreclosed from recovery under RCW 21.20.430(1).

The scienter issue under WSSA also must be addressed. In 1981, WSSA was amended so that when a state officer materially aids the offer or sale of certain securities, the State can be held liable only if the plaintiff establishes scienter. RCW 21.20.430(7).[5] "Scienter" is defined to encompass misrepresentations and material omissions, whether deliberately or recklessly made. *Burgess v. Premier Corp.*, 727 F.2d 826, 832 (9th Cir. 1984). We have already decided earlier in this opinion that the letter might have contained deliberate misrepresentations. The same facts could show that the Auditor acted with the requisite scienter.

Because the State has failed to show that there are no facts under which the bondholders could prevail, we hold that the bondholders' WSSA claim was improperly dismissed on the CR 12(b)(6) motion.[6]

---

[5]This court has already held in *Haberman* that retroactive application of this statute does not violate the constitution. *Haberman,* at 136–47. Accordingly, the amendment is applicable to the current case.

[6]The bondholders have also argued that the State should be held secondarily liable under RCW 21.20.430(3) and that an implied remedy exists under RCW 21.20.010. However, because we have already concluded that the bondholders have sufficiently stated a WSSA claim under RCW 21.20.430(1), we need not address these other issues.

## Tortious Interference

The bondholders' complaint alleges that the State intentionally interfered with their contract with the Supply System by participating in the Supply System's decision to terminate the projects. This termination precluded the generation of revenue from the sale of electricity, leading to the Supply System's default and the bondholders' eventual losses.

The elements of tortious interference with a contract or business relationship are as follows:

> (1) existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy by the alleged interfering party; (3) intentional interference inducing or causing breach or termination of the relationship or expectancy; and (4) resultant damage.

*Sea–Pac Co. v. United Food & Comm'l Workers, Local 44,* 103 Wn.2d 800, 805, 699 P.2d 217 (1985); *Calbom v. Knudtzon,* 65 Wn.2d 157, 162–63, 396 P.2d 148 (1964).

The first element is satisfied in this case because the bond resolution and the bonds constitute a valid contract between the Supply System and the bondholders. See resolution 890 of the Supply System Board of Directors (Bond Resolution) § 14.1. Furthermore, because there can be no doubt that State officials were aware of the contract, the second element is also satisfied.

■ The parties have focused much of their attention on the third element. The bondholders allege that the State intentionally interfered with their contract and thereby caused a breach or termination of the contract. In particular, the bondholders allege that the Governor and state legislators interfered by playing a role in the Supply System's decision to terminate the projects. The State's role allegedly included legislators' public statements that the projects should be terminated, the formation of the Governor's "blue ribbon commission" investigating possible consequences of termination, and inquiries into the projects by

legislative committees and the State Auditor. These specific allegations must be accepted as true and must prevail despite the State's insistence that these government officials did not direct or require the Supply System to terminate the projects. The bondholders must be given an opportunity to prove if, in fact, such events occurred.

The third element also requires that the plaintiff prove that the interference caused a breach or termination of the contract. Under the contract, the Supply System agreed to "proceed with all reasonable diligence to and will construct to completion at the earliest practicable time the Projects". Bond Resolution § 9.1. If the bondholders are correct in alleging that the State interfered by causing the termination of the projects, and such termination was premature, then the State's interference conceivably caused the Supply System to breach this contractual obligation. Further facts are needed before a decision can be made about whether the Supply System indeed failed to act with reasonable diligence.

The fourth element, resultant damages, involves both causation and damages. In the section of our opinion above dealing with Auditor's statutory duties, we have already shown that the bondholders have made sufficient allegations concerning causation to show that they might be able to prove causation at trial. Furthermore, there has been no argument that the bondholders did not suffer damages. Therefore, the bondholders' tortious interference claim should not be dismissed for failure to state a claim.[7]

---

[7]The dissent argues that this claim should have been dismissed because the State was acting in a discretionary manner. However, determining if a governmental act was discretionary or operational usually involves questions of fact that cannot be resolved in a CR 12(b)(6) case. *Barnum v. State*, 72 Wn.2d 928, 930, 435 P.2d 678 (1967). The pleadings in this case allege only that the State decided to participate in the Supply System's activities; they do not in any way provide us with any information as to how the State reached its decision in this area. Accordingly, we conclude that this question can be answered only after facts have been developed through the discovery process. *See Barnum*, at 930.

## Unjust Enrichment

The bondholders contend that the State has been unjustly enriched at their expense because the State received benefits from the construction projects while the bondholders suffered the losses. Under Washington law, a party must make restitution when it has been unjustly enriched at the expense of another. *Chemical Bank v. WPPSS*, 102 Wn.2d 874, 909, 691 P.2d 524 (citing Restatement of Restitution § 1 (1937)), *cert. denied,* 471 U.S. 1065 (1984). A party is enriched if it has received a benefit, which includes any form of advantage, including being saved from a loss. Restatement of Restitution § 1, comments *a, b* (1937).

On appeal, the bondholders support their claim with the following factual allegations: (1) if the Supply System had not been available as a financing vehicle, the State would have been forced to finance the project itself; (2) if the State had been forced to do so, it would now be subject to the losses currently being suffered by the bondholders; (3) the State has been saved from this loss, which by definition constitutes a benefit; and (4) it is unjust for the State to retain this benefit.

This particular benefit, however, is precluded by this court's decision in *Chemical Bank v. WPPSS, supra,* where we held that the Participants were not unjustly enriched at the expense of the bondholders:

> We find persuasive respondents' theory that the benefits of the bond revenues flowed to WPPSS and no further. WPPSS contracted with the bondholders, received their money and appropriated it for its purposes. We can see no benefit to the participants in these circumstances.

*Chemical Bank,* at 911. The Participants were saved from these same losses, yet this was not held to be a benefit. If this was not a benefit to the Participants, then it was not a benefit to the State.

The bondholders alleged additional benefits at the trial court level. These alleged benefits included two partially

constructed power plants, increased tax revenue from the projects' construction, and an improved economy. However, these allegations are wholly speculative in nature and are insufficient to preclude dismissal under CR 12(b)(6).

Accordingly, the trial court did not err in dismissing the bondholders' unjust enrichment claim. However, for each of the other claims, facts could exist which would justify a recovery for the bondholders. Therefore, we reverse the trial court's dismissal of these claims and the matter is remanded for further proceedings.

UTTER, BRACHTENBACH, DOLLIVER, and CALLOW, JJ., concur.

PEARSON, C.J., and ANDERSEN, J., dissent.

DORE, J. (dissenting)—I dissent.

The appellants sue on nine causes of action. The majority recognizes eight of the nine as justiciable. Seven of those claims turn on the construction of a letter written by the State's Auditor. That letter does not support the appellants' allegations because the writing and dissemination of that letter were acts beyond the authority of the Auditor. Being ultra vires, the letter created no obligations and no liability on the part of the State. The eighth cause of action is barred by the well recognized rule that the State and its agents are not liable for alleged injuries resulting from the making of policy. There is no reason under CR 12(b)(6) that we cannot read the letter, draw these conclusions and affirm the dismissal of the first eight causes of action. I agree with the majority that the ninth cause of action does not pass muster under CR 12(b)(6), but I fail to see any distinction between that claim and the appellants' other eight. I would therefore dismiss the appellants' suit in its entirety.

## THE AUDITOR'S LETTER

During the period at issue here, the State Auditor's letter appeared in WPPSS' annual reports.

To Whom It May Concern:

The Washington State Auditor's Division of Municipal Corporation[s] conducts a continuous examination of all of the operations of the Washington Public Power Supply System, including each and every project. Reports are issued covering each fiscal year, and are public documents.

On every such examination, state law requires that inquiry shall be made as to the financial condition and resources of the Supply System, whether the Constitution and laws of the state, the resolutions and orders of the Supply System, and the requirements of the Division of Municipal Corporations have been properly complied with; and into the methods and accuracy of the accounts and reports.

> Very truly yours,
> Robert V. Graham, State Auditor

Clerk's Papers, at 33. The appellants' allegations are based on the second paragraph of this letter. That paragraph is nothing more than a very close paraphrase of RCW 43.09-.260, which provides:

On every such examination, inquiry shall be made as to the financial condition and resources of the taxing district; whether the Constitution and laws of the state, the ordinances and orders of the taxing district, and the requirements of the division of municipal corporations have been properly complied with; and into the methods and accuracy of the accounts and reports.

While this summary of the Auditor's statutory duties lies at the heart of seven of the appellants' causes of action, it cannot support any of them.

## The Public Duty Doctrine and Ultra Vires Acts

The appellants' complaint asserts four claims based on RCW 43.09.260 and RCW 54.24.070. Appellants allege that the State Auditor failed to perform or negligently performed his duties under each of these statutes. However, both statutes create duties owed to the public at large, not to appellants or any other separate individuals. Our "public

duty doctrine" therefore bars these four tort claims. *Bailey v. Forks,* 108 Wn.2d 262, 737 P.2d 1257 (1987).

The majority finds that an exception to the doctrine applies here, because a "special relationship" existed between the appellants and the Auditor, which converted his duties to the public to duties owed to them personally. Generally, the special relationship exception exists where there is contact between a public official and the plaintiff and the plaintiff justifiably relies on the acts or assertions of that official. *Bailey v. Forks,* 108 Wn.2d at 268. The act the appellants rely on here is the Auditor's writing the letter and the dissemination of that letter by WPPSS, which, it is alleged, the Auditor knew or should have known of.

However, the Auditor's letter cannot give rise to a special relationship because his writing and disseminating it was ultra vires and as a consequence it can have no legal effect. The appellants' complaint suggests that the Auditor wrote his letter at the instance of WPPSS' bond counsel, who was concerned that the amendment of RCW 54.24.070, relieving the Auditor of the duty to register, certify and sign bonds, would adversely affect the marketability of WPPSS' bonds. Clerk's Papers, at 32–33. Providing such reassurances to the bond market on behalf of WPPSS is not within the statutory duties of the State Auditor. RCW 43.09.050. Because he acted without authority, the Auditor's act can have no legal effect and cannot have given rise to a special relationship. The appellants' claims are therefore still barred by the special duty doctrine.

The situation is no different from that presented in *Chemical Bank v. WPPSS,* 99 Wn.2d 772, 666 P.2d 329 (1983), in which we invalidated certain financing arrangements on the ground that the municipal corporations involved exceeded their authority in agreeing to them. We held there:

> In the present case, the participants lacked substantive authority to enter into this type of contract . . . As such,

these contracts failed to protect unsuspecting individuals, the ratepayers, represented by the participants. By choosing such an alternative arrangement in lieu of a statutory scheme that incorporated protections against those very liabilities, the participants exceeded their statutory authority, rendering the contracts ultra vires.

*Chemical Bank,* at 798. If a contract is void because there was no power to agree to it, an act beyond the scope of the State Auditor's authority cannot be the basis of a special relationship. There can never be justifiable reliance creating a special relationship, just as there can be no agreement creating a contract. It is not within the Auditor's authority to act on behalf of WPPSS in order to enhance the value of its bonds in the market. Such an act was not among the Auditor's duties and, as this very suit illustrates, was contrary to the interests of the people of this State. Since the Auditor did not, therefore, create a special relationship, the appellants' negligence claims are barred by the public duty doctrine.

## MISREPRESENTATION AND ULTRA VIRES ACTS

The same analysis applies to bar the appellants' claims for fraud, negligent misrepresentation and a violation of The Securities Act of Washington, RCW 21.20.010. All these causes of action require a showing of a false statement of material fact. Appellants allege that the Auditor's letter constitutes this false statement of fact. Essentially the same contention was made in *Devoe v. State,* 48 Ohio App. 2d 311, 357 N.E.2d 396 (1975). The Ohio court held that ultra vires acts could not form the basis for a claim of fraud.

Plaintiffs contend that the officers and employees of the division of securities of the state acted contrary to the authority vested in them by statute and registered certain securities which not only did not meet the statutory requirements, but which such officers and employees knew were fraudulent. If plaintiffs' allegations be correct, the acting [*sic*] of the officers and employees of the division of securities were *ultra vires,* not being authorized

by law and being contrary to the interest of the state itself.

*Devoe,* at 317. The same reasoning applies here. If we accept the appellants' allegations as true, and assume the Auditor made a false statement of material fact, he has acted against the interests of the State and beyond his lawful authority. His act being ultra vires, it is without legal effect and cannot create liability on behalf of the State. The claims for fraud, negligent misrepresentation and securities fraud were therefore properly dismissed under CR 12(b)(6).

## Acts Alleged To Constitute "Tortious Interference" Are Immune

The appellants allege that the Legislature and the Governor tortiously interfered with WPPSS' projects by investigating the conduct of WPPSS and the consequences of terminating the projects and by making public statements to the effect that the projects should be terminated.

In conducting their investigations and in discussing this matter of public interest, these elected officials were engaged in the making of public policy. It is clear beyond question that such acts cannot lead to liability on the part of the State. *Cougar Business Owners Ass'n v. State,* 97 Wn.2d 466, 647 P.2d 481, *cert. denied,* 459 U.S. 971 (1982). In *Cougar,* the Governor had "red–lined" the area surrounding Mount St. Helens, which resulted in harm to businesses in the town of Cougar. We held that the Governor's actions were immune from liability.

While the doctrine of sovereign immunity has been abolished, Const. art. 2, § 26; RCW 4.92.090, there is an exception for the exercise of discretion in formulating public policy. A 4–part test applies.

> (1) Does the challenged act . . . necessarily involve a basic governmental policy, program, or objective? (2) Is the questioned act . . . essential to the realization or accomplishment of that policy, program, or objective . . .? (3) Does the act . . . require the exercise of basic policy evaluation, judgment, and expertise . . .? (4) Does the governmental agency involved possess the requisite

constitutional, [or] statutory . . . authority . . . to do or make the challenged act . . .?

*Evangelical United Brethren Church v. State,* 67 Wn.2d 246, 255, 407 P.2d 440 (1965).

WPPSS is a joint operating agency with all the powers and duties of a municipal corporation, RCW 43.52.391, but that does not exempt it from the police powers of the State. It is well within the authority of the Legislature and the Governor to investigate and to consider appropriate action where the conduct of such an agency appears to conflict with the public interest. In taking such action, the Legislature and the executive are protecting the basic interests of the State and its citizens, and legal immunity is required in order to insulate their actions from interference by this coordinate branch of government. *Bender v. Seattle,* 99 Wn.2d 582, 588, 664 P.2d 492 (1983). Since the actions on which the claim for tortious interference is based are immune, the claim was properly dismissed under CR 12(b)(6).

## THE APPELLANTS' OWN ALLEGATIONS NEGATE THEIR CLAIMS UNDER CR 12(b)(6)

In cases where the pleadings themselves contain factual allegations that negate the cause of action, dismissal under CR 12(b)(6) is appropriate. The rule that the facts should be construed in the light most favorable to the plaintiff does not require the court to turn a blind eye to facts asserted by the plaintiff which negate his cause of action.

A plaintiff who files a long and detailed complaint may plead himself out of court by including factual allegations which if true show that his legal rights were not invaded.

*American Nurses' Ass'n v. Illinois,* 783 F.2d 716, 724 (7th Cir. 1986). This is the case here. The appellants allege that the Auditor issued his letter for the purpose of assisting WPPSS in the marketing of its bonds. On a CR 12(b)(6) motion, we take that allegation to be true. If it is true, the Auditor's act was ultra vires and the appellants have no

special relationship and their claim is barred by the public duty doctrine.

The appellants allege that the Auditor made a false statement of material fact. If that is true, he acted beyond his authority and contrary to the interests of the State. His act was ultra vires and cannot form the basis of liability on the part of the State.

The appellants allege that the State negligently interfered with WPPSS' projects when the Legislature investigated the management of WPPSS. This allegation covers *20 pages* in the appellants' complaint and sets out the facts in support of their claim with the specificity one would expect in an affidavit or findings of fact, including names, dates and citations to public records. Clerk's Papers, at 38–57. It is highly unlikely the appellants will offer any facts beyond those set forth in the complaint, especially since the facts in connection with this claim are part of the public record and are unlikely to be further developed through discovery. Under these circumstances, it is absurd for the court to turn a blind eye to the facts, so that more time and money may be spent on what are now known to be unmeritorious claims. The negligent interference claim was therefore properly dismissed and this court should affirm.

With regard to the seven causes of action that depend for validity on the Auditor's letter, there is another sense in which the majority misapplies the law of CR 12(b)(6) in upholding the appellants' claims. The majority concludes that the letter created a special relationship and constitutes a false statement of fact because someone *might* have read the letter in a way that supports these claims. On that theory, anyone who misinterprets a document issued by a public agency would have a claim against the responsible official or agency and the State, city or county would have to defend that action. This is an absurd result.

The rule that the plaintiff can negate his own cause of action by his own allegations applies with special force when the claim rests on a particular document. *See Tenopir v. State Farm Mut. Co.*, 403 F.2d 533 (9th Cir. 1968).

*See* 5 C. Wright & A. Miller, *Federal Practice* § 1357, at 604–05 (1969). The law under CR 12(b)(6) does not require a court to interpret a document out of existence at a preliminary stage of the litigation, just so the same document can be considered later after more time and money have been spent. If it does not support the plaintiff's claims, that will be evident on the face of the document. The court should dismiss. *See Nichols v. Severtsen,* 39 Wn.2d 836, 239 P.2d 349 (1951) (demurrer upheld where exhibit to complaint for malicious prosecution showed proceedings had not been terminated favorably to plaintiff).

For example, in *Western Reserve Oil & Gas Co. v. New,* 765 F.2d 1428 (9th Cir. 1985), the plaintiff alleged that a prefiling notification letter sent to his limited partners by the IRS constituted a constitutional tort. The court affirmed a Fed. R. Civ. P. 12(b)(6) dismissal because the letter did not affect any recognizable constitutional interest. That was apparent from the face of the letter. The court was not required to consider hypothetical interpretations of the letter by the limited partners under which a constitutional interest might have been affected. The possibility that someone reading the letter might have read it in a way that would constitute a tort was not sufficient to get the plaintiff over the Fed. R. Civ. P. 12(b)(6) hurdle.

This case is no different. The majority argues:

> Finally, the letter could plausibly be interpreted by its readers to contain implicit assurances.

Majority, at 423. This is nonsense. The question is whether the *Auditor* has acted to create a special relationship. This court can read the Auditor's letter. It does not, on its face, say anything more than what the statutory duties of the Auditor are. It does not support the appellants' claims *and it never will.* Dismissal of the seven causes of action that depend on it was entirely proper.

## Unjust Enrichment

I agree with the majority that the appellants' ninth cause of action, for unjust enrichment, was properly dismissed

because the State has not benefited from the financing of these nuclear projects. I am mystified by the majority's reasoning, however.

> The bondholders alleged additional benefits at the trial court level. These alleged benefits included two partially constructed power plants, increased tax revenue from the projects' construction, and an improved economy. However, these allegations are wholly speculative in nature and are insufficient to preclude dismissal under CR 12(b)(6).

Majority, at 434–35. Why, suddenly, is the majority no longer willing to speculate in order to uphold the appellants' causes of action? How are the benefits to the State cited here any more speculative than the "possible meanings" of the Auditor's letter? Clearly there must be some limit to the hypothetical facts which will support a cause of action in the face of a CR 12(b)(6) challenge. It escapes me how the subjective understanding of a bondholder reading a letter reprinted in an annual report can be permissible speculation while the benefit to the State from increased tax revenues is too speculative to save this cause of action from dismissal. I would therefore dismiss all the appellants' causes of action along with the claim for unjust enrichment.

## CONCLUSION

None of the appellants' nine causes of action is valid. The Auditor's letter, being an ultra vires act, has no legal effect. It cannot be the basis of a special relationship and it cannot constitute a misrepresentation for which the State can be held liable. *Chemical Bank v. WPPSS,* 99 Wn.2d 772, 666 P.2d 329 (1983); *Chemical Bank v. WPPSS,* 102 Wn.2d 874, 691 P.2d 524, *cert. denied sub nom. Haberman v. Chemical Bank,* 471 U.S. 1065 (1985). The claims for tortious interference were properly dismissed by the trial court on the ground of sovereign immunity. *Cougar Business Owners Ass'n v. State,* 97 Wn.2d 466, 647 P.2d 481, *cert. denied,* 459 U.S. 971 (1982).

The dismissal of all claims should be affirmed.

I dissent.

GOODLOE, J., concurs with DORE, J.

Reconsideration granted December 8, 1988.