103 P.3d 836 (2004)
Robert HARVEY and Marissa Harvey, individually and as husband and wife, and the marital community composed thereof, Appellants,
v.
The COUNTY OF SNOHOMISH, a political subdivision of Washington State, Snohomish County Sheriff's Office, an agent of Snohomish County, Rick Bart, Snohomish County Sheriff, an agent and employee of Snohomish County, SNOPAC and the Board of Directors of SNOPAC, a political subdivision and agency of Snohomish County, and Jane Doe # 1, an employee of SNOPAC and an agent of Snohomish County, Respondents.
No. 53449-1-I.
Court of Appeals of Washington, Division 1.
December 20, 2004.
*838 Sean Conroy, Lynnwood, for appellants.
Janice Ellis, Snohomish County Deputy Pros. Atty., and Mark R. Bucklin, Keating, Bucklin & McCormack, Seattle, for respondents.
GROSSE, J.
Public agencies cannot use interlocal cooperation agreements to shield themselves from their obligations and responsibilities under the law.[1] Therefore, Snohomish County and the Snohomish County Sheriff's Office cannot use the interlocal cooperation agreement that created its 911 communications center (SNOPAC) as a shield against Robert Harvey's negligence claims. This principle is consistent with the law of agency. We reverse summary judgment favoring Snohomish County, the Snohomish County Sheriff's Office, and SNOPAC, and affirm summary judgment favoring Sheriff Rick Bart.

FACTS
Robert Harvey, his infant son, and his friend Alex Keltz were outside Harvey's apartment building in Snohomish County when a man drove up to the building. The man appeared intimidating; his eyes were large and red, his face was painted white, and he told Harvey and Keltz that he was "[t]here to serve God." Harvey took his son and fled to his apartment along with Keltz, and locked the door. They ran upstairs, called 911, and Harvey went to his back bedroom to retrieve his pistol.
Keltz reported to the 911 operator that the man was trying to break into the apartment. The man was hitting the door, shaking the doorknob, and screaming, "[L]et me in, I'm here to serve God." During the next 15 minutes, the man tried persistently to break into the apartment. He finally broke a window, entered the apartment, and ran toward Harvey with his arms up, screaming. Harvey shot the man several times in self defense and physically struggled with him before Harvey was able to grab his son and escape with Keltz through the front of the apartment and out to the street.
During the 15-minute ordeal, the 911 operator first kept Keltz, and then Harvey on the telephone, assuring them that she had reported the break-in to law enforcement. In response to several questions by Harvey to the effect of whether the police were there at *839 his location, the operator told him yes. But in fact, until at least two minutes after Harvey and the others escaped to the street, the officers were not at Harvey's apartment; they were staging hundreds of yards away.
The 911 operator worked at SNOPAC, a communications center established by an interlocal cooperation agreement that provides 911 emergency operator services to various government entities, including Snohomish County.
Harvey sued Snohomish County, the Snohomish County Sheriff's Office, Snohomish County Sheriff Rick Bart, SNOPAC, SNOPAC's board of directors, and the 911 operator (as a Doe defendant) in federal court, claiming civil rights violations, negligence, and negligent infliction of emotional distress. After remand to the Snohomish County Superior Court, several of the defendants moved for summary judgment, and they prevailed. Only the common law tort claims remain in the case. Harvey does not appeal the dismissal of the 911 operator, Jane Doe.

ANALYSIS
The defendants claim that they are shielded from liability by the public duty doctrine, while Harvey argues that the defendants owed him a duty under the special relationship exception to the public duty doctrine.
"`Under the public duty doctrine, no liability may be imposed for a public official's negligent conduct unless it is shown that "the duty breached was owed to the injured person as an individual and was not merely the breach of an obligation owed to the public in general (i.e., a duty to all is a duty to no one)."'"[2]
"There are four exceptions to the public duty doctrine in which the governmental agency acquires a special duty of care owed to a particular plaintiff or a limited class of potential plaintiffs. These exceptions include (1) legislative intent; (2) failure to enforce; (3) the rescue doctrine; and (4) a special relationship."[3] "The question [of] whether an exception to the public duty doctrine applies is thus another way of asking whether the State had a duty to the plaintiff."[4]
Only the special relationship exception is at issue in this case." `The special relationship exception is a "focusing tool" used to determine whether a local government "is under a general duty to a nebulous public or whether that duty has focused on the claimant."'"[5] A special relationship arises where:
"`(1) there is direct contact or privity between the public official and the injured plaintiff which sets the latter apart from the general public, and (2) there are express assurances given by a public official, which (3) gives [sic] rise to justifiable reliance on the part of the plaintiff.'"[6]

Privity
"`The term privity is used in the broad sense of the word and refers to the relationship between the police department [or fire department] and any "reasonably foreseeable plaintiff." The direct contact or privity between the public official and an injured plaintiff must set the injured plaintiff apart from the general public.'"[7] It is uncontested that privity existed between SNOPAC and Harvey. However, Snohomish County and the Snohomish County Sheriff's Office argue that they had no direct contact or privity with Harvey because the 911 operator *840 was not a County employee, but an employee of SNOPAC, which is not a County agent.
In prior case law, privity between a plaintiff and a public agency has been found in 911 telephone calls or personal communications, the nature of which set the plaintiffs apart from the general public.[8] Here, Harvey similarly alleges that the nature of his contact with the 911 operator set him apart from the general public. But unlike previous cases, this case involves an additional fact: the 911 operator worked at SNOPAC, a communications center created pursuant to an interlocal cooperation agreement to provide 911 emergency services to several government agencies, including the Snohomish County Sheriff's Office.
The parties do not dispute that SNOPAC was created pursuant to an interlocal cooperation agreement. Under the interlocal cooperation agreement statute the public agencies that created SNOPAC were required to specify, among other things, "[t]he precise organization, composition and nature of any separate legal or administrative entity created thereby together with the powers delegated thereto...."[9] Thus, SNOPAC owes its existence and powers to Snohomish County Sheriff's Office, and the other parties to the interlocal cooperation agreement. Furthermore, in acting as Snohomish County's 911 communications center, SNOPAC was not merely acting on its own behalf but also on behalf of the other participants to the agreement, such as Snohomish County and its Sheriff's Office. Therefore, SNOPAC was acting "at the instance of and in some material degree under the direction and control of" Snohomish County, and thus as its agent for the purposes of delivering 911 communications services.[10] Since SNOPAC was acting as Snohomish County's agent when it was contacted by Harvey, privity exists.
Moreover, the interlocal cooperation agreement statute specifically states that public agencies cannot escape their legal obligations or responsibilities simply by entering into an interlocal cooperation agreement. RCW 39.34.030(5) states:
No agreement made pursuant to this chapter relieves any public agency of any obligation or responsibility imposed upon it by law except that:
(a) To the extent of actual and timely performance thereof by a joint board or other legal or administrative entity created by an agreement made hereunder, the performance may be offered in satisfaction of the obligation or responsibility[.]
This statute was applied in Western Washington University v. Washington Federation of State Employees, where the court of appeals held that the university's power to enter into an interlocal cooperation agreement was expressly subject to the university's obligations and responsibilities under the Higher Education Personnel Law.[11] It is worth noting that, the Attorney General has opined that RCW 39.34.030(5) precludes a public agency from avoiding bidding requirements by using an interlocal cooperation agreement to direct a separate entity to perform purchasing functions without the required bidding procedures.[12] It follows that Snohomish County defendants cannot avoid their duty to Harvey simply because its communications center was an entity established pursuant to an interlocal cooperation agreement.

Express Assurances
"A government duty cannot arise from implied assurances. `It is only where a *841 direct inquiry is made by an individual and incorrect information is clearly set forth by the government, the government intends that it be relied upon and it is relied upon by the individual to his detriment, that the government may be bound.' The plaintiff must seek an express assurance and the government must unequivocally give that assurance."[13]
In Chambers-Castanes, the Supreme Court found express assurances were made when Steve Ann Chambers-Castanes telephoned 911.[14] In her first call, after several other witnesses had already called to report the incident, she stated, "This is the fifth call. No one has responded. It's been a half-hour."[15] After she gave a more specific description of her location, the operator said, "All right, we'll get somebody up there then."[16] When Chambers-Castanes called a second time she stated, "We need some police here, there shouldn't be any trouble." The operator responded, "We have the officer; he is on the way."[17] When she called a third time to ask whether anybody had been dispatched, the operator told her, "Yes, they're on their way ... they'll be there momentarily."[18] When Chambers-Castanes told the operator she really needed some assistance, the operator stated, "They'll be there just anytime now. They're on their way."[19]
In Beal, express assurances were given to Melissa Fernandez when a 911 operator told her that police would be dispatched to assist her.[20] She told the operator her estranged husband "had been harassing her and threatening her, and she had been told in order not to break the no contact order she needed `a civil standby' to come out."[21] The operator told her, "We'll get the police over there for you okay?"[22]
Moreover, in Noakes v. Seattle this court found that the 911 operator's simple statement, "we'll send someone out" could be construed by a reasonable trier of fact as an express and explicit assurance that the police would be right out.[23]
In Babcock, however, the petitioners did not seek any assurance from the fire fighter nor did they claim to have specifically sought such assurance.[24] The fire fighter's statement that the fire fighters would "take care of protecting" the petitioners' property did not indicate she or the other fire fighters would act in a specific manner, thus no express assurances were given.[25]
Here, Harvey cites four of the 911 operator's statements from the call transcripts. These four statements appeared in the following exchanges:
[Keltz]: Ma'am, get a cop out here right now!
911: Okay [Keltz], I've already let them know. I've already let them know what's happening.
...
[Keltz]: We have no freaking clue [who the intruder is]!
911: Okay. Hang on. I've let `em know, okay?
...

*842 [Harvey]: He still tried. I don't want to shoot him.
911: Yeah, I think that's a good idea, as soon as you see the police officers, go ahead and secure the gun and let me know ... but don't hang up on me, you have to let me know.
...
911: Hang on, stay on the line, do not hang up with me, okay?
Other exchanges support Harvey's case, including specific inquiries by Harvey and answers by the 911 operator. These include:
[Harvey]: He's rubbing on it hard. Oh, damn it, where are they?
911: Well you've seen them so you know that they're there.[26]
...
[Harvey]: Oh [expletive], where are they at? Where in the hell are they at?
911: All right Robert, well, hang on, I know that they're in the area, okay? ... Actually, there are five deputies in that area.
...
[Harvey]: Okay. [Keltz], is a cop there?
[Keltz]: No, that's a regular car coming in, just went by.
911: Well, I can assure you (unintelligible).
...
[Keltz] in background: Come on, where are the cops at?
911: They're there. Tell, tell [Harvey] ... they are definitely there, they're setting up now.
[Harvey]: They're here [Keltz], they're here, they're setting up, they're here.
...
[Harvey]: He's pounding on my windows. Should, should we lock ourselves up in the bathroom or anything? Or....
911: If you feel safe enough to go ahead and lock yourself up in the bathroom.
[Harvey]: The cops are here you said?
911: They're definitely there. Again, they're setting up.
...
Banging noise.
[Harvey]: He's throwing [expletive] against the window right now.
911: Okay.
[Keltz] in background: Are the cops here?
[Harvey]: Are they here because they need to go now!

911: Okay, I'm letting `em know, I'm letting `em know what's going on, okay?
...
[Harvey]: He's, he's breaking [expletive] on my deck. (unintelligible) They need to act! What's going on?
911: Okay, where are you guys at now?
[Harvey]: We're in the back bathroom in the house. They need to act quick. He's, he's gonna creep through it. Don't let him, keep the [expletive]. Are the cops here?
[Harvey]: Are they here?
911: (unintelligible)[27]
These statements, while arguably not as assuring or as explicit as those in Chambers-Castanes seem at least as assuring and explicit as the assurance in Beal, and certainly more assuring than the statements in Babcock and Noakes. In the context of the incident, a jury could find that Harvey was evaluating his options based on the information that the 911 operator was providing to him. It is evidence that he was asking for assurances that the police were there, so that he did not have to pursue an alternative course of action. Viewing the facts in the light most favorable to Harvey, it appears that the operator gave Harvey at least one assurance  a false one  when she said, "you know that they're there," when the officers had not yet arrived.
Moreover, it is for a jury to consider whether the 911 operator gave Harvey false *843 information when she repeatedly told him that the officers were "there" when in fact the police were hundreds of yards away. In a police report taken shortly after the incident, Harvey stated that after he exited the apartment and went out onto the street, "We're screaming `Help 911.' We're out in the street for another couple minutes. Nobody's around.... We finally see policemen down the road less then [sic] a quarter mile, a couple hundred yards down the road."
And although not quoted above, the operator told Harvey time after time to "hold on," and to stay on the telephone. She also told Harvey to secure his gun "as soon as you see the police officers."
While it could be argued that Harvey did not seek an express assurance, and the 911 operator made no unequivocal express assurance, we cannot conclude that, as a matter of law, no reasonable trier of fact could conclude otherwise. Even the cold transcripts of the telephone call suggest that a reasonable jury could conclude that express assurances were asked for and given.

Justifiable Reliance
"Whether a party justifiably relies upon information is a question of fact generally not amenable to summary judgment."[28] In Noakes, this court found that the plaintiffs' indications that they had relied on the police assurances, along with the fact that they had remained in the house rather than attempting other methods of escape or self-assistance were sufficient evidence of justifiable reliance to survive summary judgment.[29] Here, Harvey indicated that he relied on similar assurances of help by remaining in the house rather than attempting to escape. The justifiable reliance issue cannot uphold a finding of summary judgment.

Proximate Cause
Lack of proximate cause represents an alternative ground upon which the trial court may have granted the summary judgment motion. "For negligent conduct to constitute proximate cause, that `conduct must cause in a direct sequence, unbroken by any independent cause, the injury complained of.'"[30]Beal[31] and Chambers-Castanes[32] make clear that proximate cause may be shown in cases with facts similar to those presented here. Because the defendants' arguments fail to distinguish these cases, summary judgment cannot be upheld for lack of proximate cause.[33]

Breach
SNOPAC argues that there was no breach of duty because SNOPAC fulfilled its duty to Harvey when it dispatched the police and kept the police updated as new information became available. However, Harvey frames the issue as whether SNOPAC acted negligently in instructing Harvey to remain in his home, rather than try to escape, which Harvey declares he would have done absent SNOPAC's express assurances. Whether or not SNOPAC's actions fulfilled or breached its duty towards Harvey is a question of fact best left to a jury.[34]

Sheriff Rick Bart
"Vicarious liability, otherwise known as the doctrine of respondeat superior, imposes liability on an employer for the torts of an employee who is acting on the employer's behalf."[35] Sheriff Rick Bart is *844 not an employer, but a supervisor. Snohomish County is the employer. He cannot be held personally responsible under a theory of vicarious liability. The case against Sheriff Bart was properly dismissed.
For the above reasons, we reverse the superior court's order of summary judgment favoring Snohomish County, the Snohomish County Sheriff's Office, and SNOPAC, and we affirm the superior court's order of summary judgment favoring Sheriff Rick Bart.
WE CONCUR: COLEMAN and AGID, JJ.
NOTES
[1] RCW 39.34.030(5).
[2] Babcock v. Mason County Fire Dist. No. 6, 144 Wash.2d 774, 785, 30 P.3d 1261 (2001) (quoting Taylor v. Stevens County, 111 Wash.2d 159, 163, 759 P.2d 447 (1988)).
[3] Babcock, 144 Wash.2d at 785-86, 30 P.3d 1261 (quoting Taylor, 111 Wash.2d at 166, 759 P.2d 447).
[4] Taggart v. State, 118 Wash.2d 195, 218, 822 P.2d 243 (1992).
[5] Babcock, 144 Wash.2d at 786, 30 P.3d 1261 (Taylor, 111 Wash.2d at 166, 759 P.2d 447).
[6] Babcock, 144 Wash.2d at 786, 30 P.3d 1261 (Beal, 134 Wash.2d at 785, 954 P.2d 237).
[7] Babcock, 144 Wash.2d at 787, 30 P.3d 1261 (citations omitted) (quoting Taylor, 111 Wash.2d at 166, 759 P.2d 447).
[8] See Chambers-Castanes v. King County, 100 Wash.2d 275, 278, 669 P.2d 451 (1983) (Privity found between the King County Department of Public Safety and Chambers-Castanes from the transcript of a police telephone log which contained the words of 911 dispatchers stating that help was on the way); Beal, 134 Wash.2d at 774, 954 P.2d 237 (Privity found between a 911 operator and the caller when the operator told the person the police were being sent to assist her); Babcock, 144 Wash.2d at 785, 30 P.3d 1261 (Privity found between a fire department and the plaintiffs when a fire fighter apparently communicated with the plaintiffs in person at their burning home).
[9] RCW 39.34.030(3)(b).
[10] Stansfield v. Douglas County, 107 Wash.App. 1, 18, 27 P.3d 205 (2001).
[11] Western Washington University v. Washington Federation of State Employees, 58 Wash.App. 433, 440, 793 P.2d 989 (1990).
[12] Wash. AGO 1979 No.2.
[13] Babcock, 144 Wash.2d at 789, 30 P.3d 1261 (citations omitted) (quoting Meaney v. Dodd, 111 Wash.2d 174, 179-80, 759 P.2d 455 (1988)).
[14] Chambers-Castanes, 100 Wash.2d at 287, 669 P.2d 451.
[15] Chambers-Castanes, 100 Wash.2d at 279, 669 P.2d 451.
[16] Chambers-Castanes, 100 Wash.2d at 279, 669 P.2d 451.
[17] Chambers-Castanes, 100 Wash.2d at 279, 669 P.2d 451.
[18] Chambers-Castanes, 100 Wash.2d at 280, 669 P.2d 451.
[19] Chambers-Castanes, 100 Wash.2d at 280, 669 P.2d 451.
[20] Beal, 134 Wash.2d at 785, 954 P.2d 237.
[21] Beal, 134 Wash.2d at 774, 954 P.2d 237.
[22] Beal, 134 Wash.2d at 774, 954 P.2d 237.
[23] Noakes v. Seattle, 77 Wash.App. 694, 699, 895 P.2d 842 (1995).
[24] Babcock, 144 Wash.2d at 791, 30 P.3d 1261.
[25] Babcock, 144 Wash.2d at 781, 30 P.3d 1261.
[26] In fact, although Harvey had seen a police car a moment before, the car had continued up the hill, without sirens. It appeared to both men that the officer was off-duty. Moreover, the 911 operator said, "you know that they're there" at 5:43:08 p.m. By the County's own admission, the first officer did not arrive "at the scene" until 5:44 p.m.
[27] At this point that the man broke into the apartment and attacked Harvey.
[28] Babcock, 144 Wash.2d at 792, 30 P.3d 1261.
[29] Noakes, 77 Wash.App. at 699, 895 P.2d 842.
[30] West Coast, Inc. v. Snohomish County, 112 Wash.App. 200, 211, 48 P.3d 997 (2002) (quoting Hoffer v. State, 110 Wash.2d 415, 424, 755 P.2d 781 (1988)) (citing Attwood v. Albertson's Food Ctrs., Inc., 92 Wash.App. 326, 330, 966 P.2d 351 (1998)).
[31] Beal, 134 Wash.2d at 786-87, 954 P.2d 237.
[32] Chambers-Castanes, 100 Wash.2d at 287-89, 669 P.2d 451.
[33] Snohomish County also claimed in its motion for summary judgment that Harvey failed to offer any proof of damages, but Harvey has submitted a psychologist's report diagnosing him with Post-Traumatic Stress Disorder.
[34] See Morse v. Antonellis, 149 Wash.2d 572, 70 P.3d 125 (2003).
[35] Niece v. Elmview Group Home, 131 Wash.2d 39, 48, 929 P.2d 420 (1997).